NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) | Supreme Court No. S-16899 |
| | ) | |
| MARVIN S. | ) | Superior Court No. 3AN-17-02570 PR |
| | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT[*] |
| | ) | |
| | ) | No. 1728 – July 3, 2019 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Frank A. Pfiffner, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Marvin S. Kathryn R. Vogel, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I.    INTRODUCTION

Marvin S.[1] was evaluated at Alaska Psychiatric Institute (API) after acting erratically and exhibiting signs of paranoia. He was diagnosed with schizophrenia, and the psychiatrist who evaluated him petitioned that he be involuntarily committed to API for 30 days. A superior court granted the petition, concluding that Marvin was gravely

---

[*]    Entered under Alaska Appellate Rule 214.

[1]    We use a pseudonym to protect the individual's privacy.

disabled and that no less restrictive alternative was available. Marvin appeals, arguing that both conclusions were erroneous. We affirm the commitment order.

## II. FACTS AND PROCEEDINGS

In 2016 Marvin S. was voluntarily admitted to API while exhibiting paranoid behavior, believing that people were trying to poison him. He was diagnosed with "substance-induced psychosis," having used psychoactive drugs prior to the onset of paranoia. Marvin was treated with anti-psychotic medication and released from API after six days.

Nearly a year later, in late 2017, a family friend with whom Marvin was living informed his mother that his condition was declining. Marvin moved in with his mother and again exhibited paranoid behavior. Shortly thereafter he was arrested after acting erratically and firing a gun near his mother and her friends. Marvin's mother petitioned that he be hospitalized for evaluation at API.[2] A screening investigation followed, and her petition was approved.

Dr. Deborah Guris, the psychiatrist who evaluated Marvin, petitioned that he be involuntarily committed to API for 30 days.[3] She alleged in the petition that Marvin was mentally ill and was both "likely to cause harm to himself . . . or others" and "gravely disabled," the two bases on which Alaska law allows a 30-day involuntary

---

[2] AS 47.30.700 allows "any adult" to petition a judge to order a screening investigation of a person alleged to be mentally ill and, depending on the results of that investigation, authorize that he or she be hospitalized for "emergency examination." *See also* AS 47.30.710-.725 (providing examination procedures).

[3] AS 47.30.730 allows mental health professionals to petition for 30-day involuntary commitment of a person they have examined. *See also* AS 47.30.735 (providing commitment procedures).

commitment.[4]  In support of these allegations, Dr. Guris noted that Marvin "endorses auditory hallucinations and the belief that others can insert their thoughts into his head as well as ideas of reference."

A magistrate judge presided over a hearing on the petition, at which Marvin, his mother, and Dr. Guris testified.  Marvin's mother described his paranoid behavior leading up to his recent evaluation.  She testified that he refused to eat food she had prepared because he was afraid she was poisoning it and that his friends and family, herself included, would not "feel comfortable" having him live with them because of his erratic behavior.

Dr. Guris reported that she had diagnosed Marvin with schizophrenia.  But she would not characterize him as grossly impaired on a cognitive level, even though he "endorsed the idea that people were blasting thoughts into his head," that "there are people out to kill him or his family," and that "his phone was hacked by the government."  She instead expressed concern that "he is paranoid and has been acting erratically . . . and unsafely in response to those paranoid beliefs."  Because of this behavior, Dr. Guris believed Marvin posed a threat of harm to others.

Dr. Guris's assessment of whether Marvin was gravely disabled was more ambiguous.[5]  She testified that he had started eating more and was able to "make his

---

[4]     *See* AS 47.30.735(c).

[5]     Marvin contends that Dr. Guris testified that he "was *not* gravely disabled," but this rests on a transcription error.  Marvin quotes the following exchange from the transcript:

> Q:     You've indicated on the petition that you think he's gravely disabled.  Is that still true today?
>
> Dr. Guris:    No.

(continued...)

needs known," so in this respect he was not gravely disabled. But she also testified that "he's [not] exercising very good judgment" and that she thought he was disabled "in that respect." Dr. Guris explained that Marvin did not concede that his behavior was alarming or concerning or that he needed treatment. She thought Marvin did not seem to fully understand the reason for his hospitalization.

Dr. Guris believed that Marvin's improvement was a direct result of the medication and structured environment provided at API. But she testified that Marvin "doesn't think that he has to" take anti-psychotic medications; he instead believed medicinal marijuana or prescription painkillers would be adequate. Dr. Guris stated that marijuana can "exacerbate symptoms [of psychosis] and make people more paranoid," but that, despite explaining this to Marvin, he "has consistently stated that he doesn't think he needs an anti-psychotic medication." Asked on cross-examination whether

---

**5**      (...continued)
However, on the audio recording of the hearing, Dr. Guris says "so" instead of "no." Correcting the transcript to reflect this, her full statement reads:

> [S]o he – he has – he wasn't eating. He was throwing up all of his food for the first couple of days he was here. He started eating more. I think that he can make his needs known, so in that respect he's not gravely disabled. . . . I don't think that he's exercising very good judgment. For example, he asked me what he would have to do to file a community ex parte to have his mother committed to the hospital since . . . he believes that she's falsely accusing him. I mean . . . it's not legal to do that, so I don't think that he's really exercising that – I don't – I think if he was well . . . that he would not exercise such poor judgment . . . so in that respect I think he's disabled.

Dr. Guris's testimony on whether Marvin was gravely disabled was thus indefinite.

Marvin could be treated with outpatient therapy, Dr. Guris said that "therapy alone is not enough to treat psychosis."

Dr. Guris also testified about Marvin's ability to support himself outside of API. She said that Marvin told her that his plan would be to "either go camp in the woods or . . . go to a shelter," and that "he understands that his mother and . . . relatives have told him that he can't come back to their homes unless he's stable and taking medications." She expressed skepticism that his erratic behavior would be tolerated at a shelter. But she thought Marvin would be able to "secure . . . food" if he were released. Asked if Marvin would be safe living in the woods, Dr. Guris replied that "[l]ots of people camp in the woods."

Marvin testified in opposition to the commitment petition. He did not want to return to live with his mother because she would require him to take medication. He also expressed a preference for therapeutic treatment over anti-psychotic medication. On cross-examination, however, he acknowledged Dr. Guris's opinion that therapy would not help his psychosis.

Asked about his plans if released from API, Marvin said: "There are many options. I am prepared to live on my own in the wilderness. I have my 60-liter backpack, tent, tarp, sleeping bag. I have everything necessary to where I could survive in the wilderness." He also noted that shelters were an option and that he could "fall back on" his best friend, who lived nearby. On cross-examination he explained that he did not have a particular spot picked out, but that he could camp "[a]nywhere outside of Anchorage." Asked what he planned to eat, he said that "[t]here's possibly still berries. There's wild edibles." He said that he could afford to "buy sandwich materials or other essential food items."

The magistrate judge recommended that the 30-day petition be granted. Marvin filed objections to the magistrate judge's recommendation and requested that the

superior court hold a new hearing. The superior court denied this motion. After listening to a recording of the hearing before the magistrate judge and considering all issues de novo, the superior court determined that Marvin was gravely disabled and that there was no less restrictive alternative to involuntary commitment. It therefore granted the 30-day petition. Marvin appeals.

## III.  STANDARD OF REVIEW

" 'Factual findings in involuntary commitment . . . proceedings are reviewed for clear error,' and we reverse only if we have 'a definite and firm conviction that a mistake has been made.' "[6] "However, whether those findings meet the statutory requirements for involuntary commitment . . . is a question of law to which we apply our independent judgment."[7]

## IV.  DISCUSSION

Marvin appeals his commitment order on two grounds. He argues that the superior court erred when it determined he was gravely disabled and also when it determined there was no less restrictive alternative to commitment at API. Having reviewed the record, we cannot conclude that either determination is erroneous. We thus affirm the superior court's order.

### A.  The Superior Court Did Not Err When It Determined That Marvin Was Gravely Disabled.

Alaska Statute 47.30.735(c) allows a superior court to order the involuntary commitment of a person whom it finds to be "gravely disabled" by "clear and convincing

---

[6]     *In re Hospitalization of Mark V.*, 375 P.3d 51, 55 (Alaska 2016) (omission in original) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007)), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[7]     *In re Naomi B.*, 435 P.3d at 923-24.

evidence." Alaska Statute 47.30.915(9)(B) defines "gravely disabled" to mean

> a condition in which a person as a result of mental illness[8] . . . will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing a substantial deterioration of the person's previous ability to function independently.

We have explained that "in order to be constitutional, AS 47.30.915[(9)](B) must be construed so that the 'distress' that justifies commitment refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled environment."[9] "[I]t is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests."[10]

The superior court found that "[w]ithout the current treatment at API, [Marvin's] judgment and reasoning would substantially deteriorate so that he couldn't function independently." It acknowledged that "the question [was] close because [Marvin] testified in an organized and coherent fashion and because Dr. Guris did not definitely say [he] was gravely disabled." However, the superior court found that Dr. Guris's testimony provided "examples of why [Marvin] is gravely disabled" that supported a gravely disabled determination in light of "all of the credible testimony."

---

**8** As the superior court noted in its commitment order, Dr. Guris's diagnosis of Marvin with schizophrenia was not disputed.

**9** *Wetherhorn*, 156 P.3d at 378. AS 47.30.915 was amended and reorganized to maintain alphabetical order in 2014. AS 47.30.915, Revisor's notes, at 1132 (2018). The definition of "gravely disabled" was renumbered from (7) to (9).

**10** *Wetherhorn*, 156 P.3d at 378 (quoting *In re Detention of LaBelle*, 728 P.2d 138, 146 (Wash. 1986)).

The superior court relied on the following factual findings to support its ultimate conclusion: (1) Marvin would "go off his medication and stop eating" if released from API; (2) Marvin would "cycle into irrational and aggressive behavior in a day or two after release if he is off medication," which would make it impossible for him to stay at a shelter; (3) Marvin's plan to live in a tent and forage for food was not feasible given the onset of winter and the likelihood that Marvin would "revert to his previous irrational beliefs that his food was poisoned"; and (4) Marvin would be unable to receive effective "mental health treatment on an out-patient basis." Each of these underlying factual findings had support in the record;[11] we cannot conclude that the superior court's gravely disabled determination was erroneous.

### 1. The finding that Marvin would discontinue his medication if discharged and stop eating was not clearly erroneous.

Much of the superior court's reasoning relied on its finding that Marvin would stop taking his medication if released from API. This finding was supported by Dr. Guris's testimony that Marvin denied he had a need for anti-psychotic medication or treatment and by her testimony that Marvin's medical record showed he had stopped taking anti-psychotic medication shortly after his 2016 discharge from API. At that time he claimed that doctors "were trying to kill him and trying to poison him with medications."

The court found that because of Marvin's "paranoid and delusional thinking," he would stop eating if he went off his medication. Testimony from Marvin's mother and Dr. Guris, who both said that Marvin would not eat when unmedicated, supported this conclusion. While Dr. Guris testified that Marvin was capable of securing

---

[11] Under a clear error standard of review, we review the record "in the light most favorable to the prevailing party." *Dara S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 426 P.3d 975, 987 n.17 (Alaska 2018).

food if released, the record supports the court's findings that if discharged from API, Marvin would stop taking his medication and eventually stop eating, even if he could secure food. We " 'will not overturn a trial court's finding based on conflicting evidence,' and will not re-weigh evidence 'when the record provides clear support for the trial court's ruling.' "[12] Dr. Guris's testimony provides no reason to overturn the court's factual finding here.

### 2. The finding that Marvin would have no feasible living option if discharged was not clearly erroneous.

The superior court's finding that Marvin would not have a safe place to live if he were discharged from API was not clearly erroneous. Testimony from Marvin's mother and Dr. Guris, as well as Marvin's own statement that he felt "like [he'd] overextended [his] stay" at a friend's house, indicated that he would be unable to find shelter with friends or relatives. Dr. Guris testified that Marvin exhibited erratic and aggressive behavior that would not be tolerated in a shelter. And the court reasonably rejected Marvin's plan to camp in the woods, noting that with the onset of winter, his ability to forage for food and care for himself would be limited.[13] Moreover, the court found that without medication, Marvin's paranoia would return and prevent him from eating any food that he bought.

---

[12] *Dara S*., 426 P.3d at 989 (first quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003), then quoting *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000)).

[13] Marvin contends that "[h]omelessness is also not an adequate justification for involuntary commitment." But the court did not base its decision solely on the possibility that Marvin would be homeless; rather, it found that the specific living conditions Marvin proposed — living in the wilderness and foraging for food — would not be feasible given his condition.

On appeal Marvin places much weight on Dr. Guris's statement that "[l]ots of people camp in the woods," arguing that her testimony undermines the superior court's finding that Marvin lacked a feasible living option. While Dr. Guris's testimony may indicate that she thought Marvin would be fine camping, she said this before Marvin testified that he was planning on camping "outside of Anchorage." Moreover, there was ample testimony about Marvin's erratic behavior, delusions, and paranoia. The minimally conflicting testimony from Dr. Guris is insufficient to overturn the superior court's finding that Marvin lacked a feasible living option outside of API.[14]

### 3. The finding that outpatient therapy was not a viable option for Marvin was not clearly erroneous.

The superior court found that "mental health treatment on an out-patient basis" would not address Marvin's needs. It based this determination on four findings, all of which are supported by the record.

First the court found that Marvin would not have access to outpatient therapy if he was living in the wilderness. Marvin argues on appeal that "he could have camped . . . in or near a city like Anchorage where" he would have had access to outpatient services. But Marvin testified that he planned on camping "outside of Anchorage," and indicated that it would be in "a wilderness situation." Second the superior court found that Marvin wanted "to smoke marijuana when released" but that marijuana would "only make[] the symptoms of schizophrenia worse." Marvin does not contest this finding. Third the superior court found that Marvin only wanted to address his illness through therapy, but that "[t]herapy is not an appropriate treatment for

---

[14]     *See Dara S.*, 426 P.3d at 989; *In re Hospitalization of Jacob S.*, 384 P.3d 758, 766 (Alaska 2016) ("Conflicting evidence is generally insufficient to overturn a fact finding, and we will not reweigh evidence if the record supports the [superior] court's finding." (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011))).

schizophrenia." Marvin had explained that he would prefer therapy, and Dr. Guris stated multiple times that therapy would not be an effective treatment for Marvin in his current condition. Fourth the superior court found that Marvin was unlikely to seek outpatient treatment at all because his "condition has worsened from December to now because he didn't get out-patient treatment" and "[p]ast conduct is a pretty good prognosticator of future activity."[15]

Marvin argues that certain actions of his, including voluntarily admitting himself to API in 2016 and agreeing to take medication while there, demonstrate his ability to seek care when needed. But the record supports a conclusion that Marvin did not recognize the need for treatment of any kind. Indeed Marvin's own testimony did not necessarily indicate that he accepted the diagnosis; he stated simply: "I am aware that they have classified me as a schizophrenic." Granting deference to the superior court's assessments of witness credibility, we cannot conclude that its finding was clearly erroneous.[16]

### 4. The superior court's determination that Marvin was gravely disabled was not impermissibly speculative.

Marvin also argues that the superior court's findings impermissibly "speculat[e] that he may decompensate at some time in the future" and overlook the fact

---

[15] We have explained that superior courts may look to recent behavior to inform commitment decisions. *See In re Hospitalization of Tracy C.*, 249 P.3d 1085, 1093 (Alaska 2011) ("[T]he court may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing."); *see also id.* at 1094 n.32 (indicating that it was appropriate for superior court to consider whether patient had stopped taking medication in the past).

[16] *Id.* at 1089 (stating that we "grant especially great deference when the trial court's factual findings require weighing the credibility of witnesses and conflicting oral testimony" (quoting *Bigley v. Alaska Pyschiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009))).

that he "was not gravely disabled . . . at the time of the commitment hearing." However, we have explained that "nothing in the statutory framework suggests that . . . the superior court is limited to considering only the symptoms exhibited by the patient on the day of the commitment hearing."[17] When making a gravely disabled determination "the court may consider the patient's recent behavior and condition as well as the patient's symptoms on the day of the hearing."[18] And we have also recognized that "the statutory subsection is forward-looking with its concern that the respondent 'will, if not treated, suffer or continue to suffer' distress as a result of the respondent's mental illness."[19]

Although forward-looking, the superior court's order was couched in the present tense; it concluded that Marvin "could not *now* live safely outside of the controlled environment of API" (emphasis added). The superior court discussed Marvin's condition at the time of the hearing, stating that although he presented well in court, he would stop taking his medication if discharged in his present state, causing his paranoia and erratic behavior to recur. It therefore adhered to our precedent, and its determination that Marvin was gravely disabled was not erroneous or improperly speculative.[20]

---

[17]  *Id.* at 1092.

[18]  *Id.* at 1093; *see also In re Hospitalization of Jeffrey E.*, 281 P.3d 84, 87-88 (Alaska 2012) ("[A] respondent must be gravely disabled at the time of the commitment hearing, but recent behavior is probative of whether the respondent is gravely disabled at the time of the hearing.").

[19]  *In re Jeffrey E.*, 281 P.3d at 88 (quoting former AS 47.30.915(7)(B) (2012) later renumbered as AS 47.30.915(9)(B)).

[20]  *See id.* (affirming involuntary commitment order when superior court found that, although medication had improved respondent's condition, he would "probably go off his medication and get back into the same situation rather quickly without

(continued...)

**B.     The Superior Court Did Not Err When It Determined That There Was No Less Restrictive Alternative To Involuntary Commitment.**

"[A] petitioner must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives."[21] "Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization."[22] Alaska Statute 47.30.915(11) defines "least restrictive alternative" as:

> mental health treatment facilities and conditions of treatment that
>
> (A) are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient; and
>
> (B) involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury.

---

[20]     (...continued) hospitalization"); *In re Tracy C.*, 249 P.3d at 1094 (affirming involuntary commitment order when trial court found that respondent was gravely disabled in part because she would "likely be hospitalized again" without further treatment, although her condition had improved by the time of the commitment hearing).

Marvin relies on our decision in *In re Hospitalization of Stephen O.*, 314 P.3d 1185 (Alaska 2013), to argue that the superior court's order was improperly speculative. In that case, we vacated an involuntary commitment order that was "based on partial and unclear evidence, much of which was hearsay," holding that it was not supported by clear and convincing evidence. *Id.* at 1195. But the superior court here principally relied on the testimony of Dr. Guris, who had treated Marvin directly, and its order was not hampered by the same evidentiary deficiencies as the one we considered in *In re Stephen O. In re Stephen O.* is thus distinguishable.

[21]     *In re Hospitalization of Mark V.*, 375 P.3d 51, 58 (Alaska 2016), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

[22]     *Id.* at 59.

Relying on its earlier findings that Marvin's proposed living arrangements were unsuitable and that he would not be able to adequately treat his schizophrenia through outpatient treatment, the superior court determined by "clear and convincing evidence . . . that there is no less restrictive alternative than API." The court explained that "[w]ithout the anti-psychotic medication that the parties have stipulated is appropriate, [Marvin] will not be able to function. . . . He will become episodically irrational, delusional, and aggressive. He will not eat. He will have severe conflict with others." As we have discussed above, these underlying findings were supported by the record and not clearly erroneous.

Marvin argues that the superior court's least restrictive alternative determination was not supported by clear and convincing evidence because "Dr. Guris appeared to summarily reject" his suggested living arrangements "without determining whether certain accommodations could make them feasible." But Dr. Guris's testimony was not conclusory. She explained in detail why Marvin would not be able to live at a shelter, explaining that the staff would not be equipped to deal with his erratic behavior. Also, as discussed above, there was support in the record for the court's findings that Marvin would neither be able to access outpatient treatment if he were living in the wilderness, nor be able to live with friends or family.

Moreover, the superior court found not only that Marvin's suggested living arrangements were not feasible, but also that outpatient treatment itself was not an available alternative to commitment at API. Marvin recognizes Dr. Guris's testimony that therapy would not treat his psychosis effectively, but argues that "[t]he fact that [he] had a different idea of what sort of treatment he needed to address his mental health is not a proper basis for finding involuntary commitment . . . is the least restrictive alternative available." On the contrary this court has frequently upheld commitment orders premised on disagreements between doctors and patients over what would be an

effective course of treatment.[23] It was not error for the court to conclude that involuntary commitment at API, allowing Marvin's psychosis to stabilize, was necessary before outpatient treatment could become a feasible alternative.

## V.    CONCLUSION

We commend the superior court for its careful and independent analysis of the evidence presented before the magistrate court. We AFFIRM the involuntary commitment order.

---

[23]    *See, e.g.*, *In re Mark V.*, 375 P.3d at 54-55, 59-60 (affirming involuntary commitment order where respondent believed he would benefit from outpatient treatment but his psychiatrist thought it was necessary to continue receiving medication at API until he stabilized); *In re Hospitalization of Joan K.*, 273 P.3d 594, 602 (Alaska 2012) (affirming involuntary commitment order supported by expert testimony that outpatient treatment would not benefit respondent suffering from bipolar disorder, who "needed to come out of her current manic episode . . . before being released").