*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity | ) | |
| for the Hospitalization of | ) | Supreme Court No. S-15536 |
| | ) | |
| MARK V. | ) | Superior Court No. 3AN-14-00679 PR |
| | ) | |
| | ) | O P I N I O N |
| | ) | |
| | ) | No. 7112 - July 1, 2016 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Mark V. Jacqueline G. Schafer and Ruth Botstein, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee State of Alaska.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

The superior court issued a 30-day involuntary commitment order after finding that Mark V. was gravely disabled and "entirely unable to fend for himself independently in the community."[1] Mark argues that there was insufficient evidence to prove he could not live independently. Although Mark's appeal is technically moot, his

---

[1]    We use a pseudonym to protect Mark's privacy.

claim raises an important question that satisfies the public interest exception: Where does family and community support fit within the involuntary commitment process and which party bears the burden of proving or disproving that a respondent has that support? We hold that the respondent's inability to function with outside support, when relevant, is part of the petitioner's burden of proving that there is no less restrictive alternative to commitment. But we find in this case that the State's evidence satisfied this burden, and we therefore affirm the 30-day commitment order.

## II. FACTS AND PROCEEDINGS

Anchorage police took Mark V. into emergency custody and transported him to the psychiatric emergency department at Providence Alaska Medical Center after he "presented himself nude in public" and claimed to be the King of England. Later that same day Providence petitioned the superior court for an *ex parte* order authorizing Mark's hospitalization at Alaska Psychiatric Institute (API), based on its determination that he was "gravely disabled" as a result of paranoid schizophrenia. The petition alleged that Mark was living in squalor and unable to adequately provide for his basic needs.

The superior court granted the petition and ordered that Mark be transported to API for an evaluation period not to exceed 72 hours. Within that 72-hour period the State filed another petition, signed by psychiatrist Dr. LeeAnn Gee and a registered nurse, seeking to extend Mark's commitment for an additional 30 days. The petition alleged that Mark was gravely disabled due to his symptoms, that he could improve with treatment, and that there were no less restrictive alternatives to involuntary commitment. The petition listed Mark's parents as potential witnesses for the State.

A 30-day commitment hearing was held before Magistrate Judge Una Gandbhir. Dr. Gee, Mark's attending psychiatrist at API since his admission, was the State's sole witness. She testified that Mark's symptoms were most representative of a bipolar type of schizophrenic disorder with manic episodes. She testified that Mark was

gravely disabled as a result: He had difficulty caring for himself, was increasingly agitated, exposed himself, threatened to hit people, and had difficulty redirecting his attention away from his delusions. But Dr. Gee also said she did not believe Mark was truly a physical threat to others or in danger of harming himself.

Dr. Gee testified that a 30-day commitment would help Mark stabilize because he could consistently receive the increased dosages of medication necessary to resolve his manic symptoms. She acknowledged that Mark had been taking medication on an outpatient basis and that he regularly received services through Anchorage Community Mental Health. She noted that Mark accepted his medication at scheduled times, but that when he was agitated he resisted taking medication that would help calm him down. Dr. Gee testified that, as a result of Mark's refusal to take oral medications, API staff had several times been required to administer emergency injections to calm him down when he became aggressive and threatening. She was concerned that Mark's inappropriate behavior would continue if he were released before his manic symptoms improved and that he would eventually return to the emergency room and API. Dr. Gee gave her opinion that if Mark returned home he would not "be able to properly maintain himself and to clean up his apartment." She testified that Mark "would continue to need his parents to help him with food or cooking at this point in time."

Mark testified next. He described the process of acquiring medication as an outpatient, identified his doctor, and agreed to continue taking his medication, though he also made conflicting statements about whether he needed it. He described exposing himself as a "mistake in judgment" and said he would sign a behavior contract to stop doing it. He testified that he used the food stamp program, paid his rent on time, and usually cleaned his apartment if given notice of an upcoming inspection. He testified that his parents helped him, but he also asserted that his father had "ripped [him] off for like, $11 grand." At the close of his testimony Mark's attorney argued that Mark should

be returned home on an outpatient treatment basis as a less restrictive alternative to hospitalization at API.

The magistrate judge made oral findings that, based on Dr. Gee's testimony, there was clear and convincing evidence that Mark was gravely disabled as a result of his mental illness and there was no less restrictive alternative to hospitalization. The magistrate judge's subsequent written order reiterated her findings that Mark was "mentally ill and gravely disabled," based both on Dr. Gee's testimony and the judge's own observations of Mark's behavior in the courtroom, which "included several uncontrollable outbursts, during which he expressed among other things his religious convictions, fear of the judicial officer, a desire not to be executed for a parking ticket, and the assertion that he is a sorcerer." The magistrate judge also noted Mark's "complete inability to be redirected in any way." She concluded that Mark's mental illness and behavior "impair his judgment and reasoning to the point where he would be entirely unable to fend for himself independently in the community."

The superior court approved the 30-day commitment order a few days later; it had an expiration date of April 25, 2014.

## III. STANDARDS OF REVIEW

"Factual findings in involuntary commitment . . . proceedings are reviewed for clear error," and we reverse only if we have "a definite and firm conviction that a mistake has been made."[2]  "[W]hether factual findings comport with the requirements of AS 47.30" is a question of law we review de novo.[3]  The mootness doctrine presents

---

[2]  *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007).

[3]  *Id.*

a question of law, and we "resolve issues of mootness using our independent judgment."[4] We also apply our independent judgment to questions of statutory interpretation.[5] We adopt the rule of law that is "most persuasive in light of precedent, reason, and policy."[6]

## IV.  DISCUSSION

### A.  We Consider The Burden Of Proof Issue Under The Public Interest Exception To The Mootness Doctrine.

Mark argues that the superior court, in finding that he was "gravely disabled" in part because of his inability to function independently, gave insufficient consideration to the possibility that he could function independently if he had appropriate support from his family. The State responds that it was Mark's burden to prove that such outside support existed. Mark's 30-day commitment period is long past, and we held in *Wetherhorn v. Alaska Psychiatric Institute* that an appeal of a commitment order becomes moot when the commitment period ends.[7] However, we review moot questions that satisfy either the public interest exception or the collateral consequences exception.[8] Here, we conclude that the public interest exception enables us to decide an issue raised by Mark's appeal: Where does family and community support fit within the involuntary

---

[4]    *In re Mark V.*, 324 P.3d 840, 843 (Alaska 2014) (citing *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001)).

[5]    *Wetherhorn*, 156 P.3d at 375 (citing *Holderness v. State Farm Fire & Cas. Co.*, 24 P.3d 1235, 1237 (Alaska 2001)).

[6]    *In re Joan K.*, 273 P.3d 594, 596 (Alaska 2012) (quoting *Olson v. State*, 260 P.3d 1056, 1059 (Alaska 2011)).

[7]    156 P.3d at 380.

[8]    *In re Mark V.*, 324 P.3d at 843 (first citing *Wetherhorn*, 156 P.3d at 380 (public interest exception); and then citing *In re Joan K.*, 273 P.3d at 597-98 (collateral consequences exception)).

commitment process, and who bears the burden of proving or disproving whether the respondent has that support?

We consider three factors in determining whether the public interest exception applies to an otherwise moot appeal: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues are so important to the public interest as to justify overriding the mootness doctrine."[9] All three factors weigh in favor of review in this case. First, the disputed issue is capable of repetition because it concerns the interpretation of the often-used civil commitment statutes and does not depend on Mark's particular circumstances.[10] Second, review of the issue could be repeatedly circumvented, since appeals of 30-day commitment orders are invariably mooted by the passage of time. And finally, the issue implicates the public interest. We have emphasized that our involuntary commitment statutes must be interpreted to protect "against the 'massive curtailment of liberty' that involuntary commitment represents" and the "variety of dangers particular to those subject to civil commitment."[11]

Because the public interest exception to the mootness doctrine is satisfied, we review the burden of proof issue on its merits.[12]

---

[9]     *Wetherhorn*, 156 P.3d at 380-81 (quoting *Akpik v. State, Office of Mgmt. & Budget*, 115 P.3d 532, 536 (Alaska 2005)).

[10]     *See E.P. v. Alaska Psychiatric Inst.*, 205 P.3d 1101, 1107 (Alaska 2009) (noting that matters of statutory interpretation do not depend on particular facts and are capable of repetition).

[11]     *Wetherhorn*, 156 P.3d at 378 (internal citation omitted) (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)).

[12]     Our conclusion that the public interest exception applies to this appeal makes it unnecessary for us to address another of Mark's arguments: that the State's

(continued...)

**B.** **The Petitioner Bears The Burden Of Proving, By Clear And Convincing Evidence, That A Respondent Is Gravely Disabled And That Commitment Is The Least Restrictive Alternative.**

Involuntary 30-day commitments are authorized by law for persons who are found to be "gravely disabled."[13] "Gravely disabled," in turn, is defined to include a condition in which a person as a result of mental illness

. . . .

(B) will, if not treated, suffer or continue to suffer severe and abnormal mental, emotional, or physical distress, and this distress is associated with significant impairment of judgment, reason, or behavior causing *a substantial deterioration of the person's previous ability to function independently*.[14]

The commitment order in this case was based on the court's finding that Mark's "mental illness and resulting behavior currently impair his judgment and reasoning to the point where he would be entirely unable to fend for himself independently in the community." Mark argues that the court misinterpreted the phrase "function independently" in AS 47.30.915(9)(B) because the court failed to account for assistance that Mark's family

---

[12](...continued) right to recover the costs of treatment under AS 47.30.910 is a collateral consequence that triggers application of the collateral consequences exception. We reserve that question for a case in which the issue is more fully developed. It is also unnecessary for us to address Mark's argument that AS 47.30.765 creates a right to appeal notwithstanding the mootness doctrine, contrary to our holdings in *Wetherhorn* and the first *In re Mark V.* opinion.

[13] AS 47.30.735(c) ("At the conclusion of the hearing the court may commit the respondent to a treatment facility for not more than 30 days if it finds, by clear and convincing evidence, that the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled.").

[14] AS 47.30.915(9) (emphasis added).

could provide. The State responds that it was Mark's burden to prove he had the necessary outside support and he failed to carry that burden.

We decline to place this burden on the respondent. Proving the respondent's inability to function independently with support, when relevant, is simply a part of the petitioner's burden of proving that there is no less restrictive alternative to involuntary commitment — a required element of any petition.

Under the governing statute, it is the State's burden in an involuntary commitment case to establish "by clear and convincing evidence" that the respondent is "gravely disabled."[15] We observed in *Wetherhorn* that part (B) of the "gravely disabled" definition, the one relevant here, appears to respond directly to the United States Supreme Court's admonition that it is unconstitutional to confine, "without more[,] a nondangerous individual who is capable of surviving safely in freedom by himself."[16] As we also noted, the Supreme Court requires a trial court to find "that the person is 'helpless to avoid the hazards of freedom either through his own efforts *or with the help of willing family members or friends.*' "[17]

This case requires that we clarify and expand on what we said in *Wetherhorn*. We reiterate that a person's inability to function outside of an institutional setting *even with the support of family and friends* is indeed a constitutionally-required part of the test for whether the person may be involuntarily committed. But whether the person has such outside support is an issue that fits uneasily within the definition of

---

[15] AS 47.30.735(c); *see also Addington v. Texas*, 441 U.S. 418, 427, 433 (1979) (holding that clear and convincing evidence is the minimum standard "that due process requires [for] the state to justify confinement").

[16] 156 P.3d at 378 (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975)).

[17] *Id.* at 376 (emphasis added) (quoting *O'Connor*, 422 U.S. at 575 & n.9).

"gravely disabled" in AS 47.30.915(9)(B). The definition establishes "the person's previous ability to function independently" as the baseline from which "a substantial deterioration" is measured; however, it is the "substantial deterioration" in that ability that is important to whether the person has become "gravely disabled," not the ability's current or historic level. In other words, under a literal reading of the definition, a person may be "gravely disabled" because of a substantial deterioration in the person's condition despite retaining some "ability to function independently."[18]

But *Wetherhorn* makes clear that the test for involuntary commitment must address the critical issue of whether the person can function independently with support, as defined in *O'Connor* — if not in the definition of "gravely disabled"[19] then elsewhere. And a different place in the analysis better corresponds with the language and structure of Alaska's 30-day commitment statutes. State policy requires that persons suffering from mental illness "be treated in the least restrictive alternative environment consistent with their treatment needs."[20] A "least restrictive alternative" is defined in AS 47.30.915(11) to mean:

---

[18]     We have previously considered this definition in terms of whether the respondent can function alone, observing that "[p]eople are deemed 'gravely disabled' when they are so unable to care for themselves that it seems very likely that they will come to serious harm without help." *Meyers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 242 (Alaska 2006) (citing then-AS 47.30.915(7)).

[19]     Discussing the preconditions to involuntary commitment identified by the Supreme Court in *O'Connor* — "(1) that the person presents a danger to self or others; or (2) that the person is 'helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends,' " *Wetherhorn*, 156 P.3d at 376 (quoting *O'Connor*, 422 U.S. at 575 & n.9) — we observed in *Wetherhorn* that "[t]he precise wording of these . . . requirements is left to the states, 'so long as they meet the constitutional minimum.' " *Id*. (quoting *Addington*, 441 U.S. at 431).

[20]     AS 47.30.655(2).

mental health treatment facilities and conditions of treatment that

> (A) are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient; and

> (B) involve no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury.

Consistent with this state policy and the explanatory definition, among the allegations that must be made in any petition for 30-day commitment is "that the evaluation staff has considered but has not found that there are any less restrictive alternatives available that would adequately protect the respondent or others; or, if a less restrictive involuntary form of treatment is sought, specify the treatment and the basis for supporting it."[21]  The availability of "less restrictive alternatives" is also addressed in AS 47.30.735, which explains the procedures and possible outcomes of a 30-day commitment hearing.  Subsection (d) provides:  "If the court finds that there is a viable less restrictive alternative available and that the respondent has been advised of and refused voluntary treatment through the alternative, the court may order the less restrictive alternative treatment for not more than 30 days if the program accepts the respondent."[22]  But the statute does not expressly require the court to find as a prerequisite to commitment that there are no less restrictive alternatives, nor does it expressly apply the "clear and convincing evidence" standard of proof to any issues other

---

[21]  AS 47.30.730(a)(2).

[22]  AS 47.30.735(d).

than whether "the respondent is mentally ill and as a result is likely to cause harm to the respondent or others or is gravely disabled."[23]

But as noted above, our precedent makes clear that the court's consideration of less restrictive alternatives to confinement, including whether the person is "helpless to avoid the hazards of freedom . . . with the aid of willing family members or friends,"[24] must be a prerequisite to commitment in order for the process to be constitutionally sound. At issue in *Wetherhorn* was the amount of "distress" a person must be suffering before involuntary commitment is justified.[25] Whether a person could survive independently with others' help was not central to the holding, but it was a part of our analysis. We concluded "that the 'distress' that justifies commitment [under the definition of "gravely disabled" in AS 47.30.915(9)(B)] refers to a level of incapacity that prevents the person in question from being able to live safely outside of a controlled

---

[23] AS 47.30.735(c). Subsection (c) expressly applies a clear and convincing standard, but only subsection (d) addresses whether "there is a viable less restrictive alternative." We note that other state statutory schemes explicitly require the court to find by clear and convincing evidence that no less restrictive alternative exists. *See, e.g.*, Minn. Stat. Ann. § 253B.09 (imposing a clear and convincing standard and requiring a court that imposes involuntary commitment to "identify less restrictive alternatives considered and rejected . . . and the reasons for rejecting"); *see also* N.D. Cent. Code Ann. § 25-03.1-21(1) ("Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization . . . ."); *In re D.Z.*, 649 N.W.2d 231, 235 (N.D. 2002) ("The court must find by clear and convincing evidence that alternative treatment is not adequate or hospitalization is the least restrictive alternative." (citing *In re J.K.*, 599 N.W.2d 337, 340 (N.D. 1999)).

[24] *Wetherhorn*, 156 P.3d at 376 (quoting *O'Connor*, 422 U.S. at 574 n.9).

[25] *Id.* at 375-79.

environment."[26] We cited the statutory requirement that a 30-day commitment petition "allege that the evaluation staff has considered but has not found that there are any less restrictive alternatives available,"[27] and we strongly implied that a committing court's finding on this subject, as with the other prerequisites to commitment, was subject to the "clear and convincing evidence" standard.[28] In a later case, *In re Joan K.*, after affirming the superior court's finding by "clear and convincing evidence that . . . [the respondent] was likely to cause harm to herself due to her mental illness," we went on to hold that "[t]he record [also] supports the superior court's finding" that there was no less restrictive alternative to a 30-day commitment — but we did not specify the standard under which the latter finding was reviewed.[29]

We now make clear what was strongly implied in *Wetherhorn*. Because a 30-day commitment petition must "allege that the evaluation staff has considered but has not found that there are any less restrictive alternatives available that would adequately protect the respondent or others,"[30] and because the trial court's deliberate consideration of this issue is critical to the protection of the respondent's liberty interests, we hold that a petitioner must prove, by clear and convincing evidence, the petition's allegation that

---

[26]     *Id.* at 378.

[27]     *Id.* (quoting AS 47.30.730(a)(2)).

[28]     *Id.* (listing the least restrictive alternative requirement among statutory protections against unconstitutional commitment and noting that "[a]s further protection, the statute directs the court to make its findings by 'clear and convincing' evidence").

[29]     273 P.3d 594, 601-02 (Alaska 2012).

[30]     AS 47.30.730(a)(2).

there are no less restrictive alternatives.[31] This is not a secondary concern, nor is it — as the structure of AS 47.30.735(c) and (d) might suggest — something to be considered only after the court has decided that the respondent should be committed. Finding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization.

## C. In Mark's Case It Was Not Error To Find That A 30-Day Commitment Was The Least Restrictive Alternative.

Mark argues that the superior court erred in finding by clear and convincing evidence[32] that he was "entirely unable to fend for himself independently in the community" because the factors upon which the court relied failed to account for his

---

[31] *Cf. In re Michelle L.*, 867 N.E.2d 1187, 1191 (Ill. App. 2007) ("To order respondent's involuntary admission to a mental-health facility, the trial court had to find, by clear and convincing evidence, that she was a '[p]erson subject to involuntary admission' . . . and that involuntary admission was the 'least[-]restrictive alternative.' " (first and third alterations in original) (internal citations omitted)). The structure of Illinois's involuntary commitment statutes is similar to that of Alaska, since the "clear and convincing evidence" standard is not expressly extended by statute, but courts have held that it applies nonetheless. *See* 405 Ill. Comp. Stat. Ann. 5/3-808 (West 2010) ("No respondent may be found subject to involuntary admission on an inpatient or outpatient basis unless that finding has been established by clear and convincing evidence."); 405 Ill. Comp. Stat. Ann. 5/3-811 (West 2011) (providing that once "any person is found subject to involuntary admission on an inpatient basis, the court shall consider alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization," and that "[t]he court shall order the least restrictive alternative which is appropriate").

[32] The "clear and convincing" evidence standard demands "a firm belief or conviction about the existence of a fact to be proved." *In re Stephen O.*, 314 P.3d 1185, 1192-93 (Alaska 2013) (quoting *In re Johnstone*, 2 P.3d 1226, 1234 (Alaska 2000)); *see also id.* at 1193 ("Clear and convincing evidence has been characterized as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt." (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 530 n.12 (Alaska 2004))).

family support and thus required him to function successfully alone. But while there was evidence that Mark could receive support from his family for the usual tasks of daily living — for example, cooking and cleaning — the evidence convincingly showed that he was unlikely to continue his required medications absent a 30-day commitment, and we therefore find no error.

The only witness the State called at the hearing was Dr. Gee, Mark's treating psychiatrist.[33] Dr. Gee did not believe Mark was ready to "return to [his] apartment and take care of himself." She clarified that "he would continue to need his parents to help him with food or cooking at this point in time. I don't think that he would be able to properly maintain himself and to clean up his apartment . . . ." While this testimony acknowledged at least the possibility of family support for the cooking and cleaning aspects of independent living, Dr. Gee's major concern was with Mark's medications. She testified that his manic episodes, which caused him to be agitated, threaten others, and expose himself and which had prompted his initial 72-hour commitment, needed to be brought under control before he could be expected to go back to a successful outpatient regimen. Although Mark accepted his scheduled medication with meals, he was "reluctant to take any oral medications to help calm him throughout the day when he becomes more agitated and threatening." Dr. Gee testified that API staff had to resort several times to administering emergency injections. She concluded that although Mark had in the past "been able to live independently . . . when he is taking medications and he is following up with the outpatient clinic," he required treatment at API to stabilize his mental illness before he could be released.

---

[33]    The State listed Mark's parents as potential witnesses in its petition but did not call them at the hearing.

Mark's comments at the hearing supported a conclusion that going back to outpatient treatment was not a realistic alternative at that time. During Dr. Gee's testimony he interjected that one of the medications was "poison. I'm allergic to that. It kills me"; he contended it had side effects related to his sexual performance; and even after promising to take his medication he later appeared to backtrack: "But I don't have to take medication at all because it's a free country. Don't you get it?"

The magistrate judge specifically found, both on the record at the close of the hearing and in the next day's written order, that there was no less restrictive alternative for Mark than a 30-day commitment. She found based on Dr. Gee's testimony that Mark was "currently unable to understand his situation, symptoms or current illness." She expressed concern "about [his] complete inability to be redirected in any way." Noting his uncontrolled outbursts and other irrational behavior during the hearing, the magistrate judge concluded that Mark's "mental illness and resulting behavior currently impair his judgment and reasoning to the point where he would be entirely unable to fend for himself independently in the community."[34] We conclude that Dr. Gee's testimony about Mark's needed medications and his inability to follow an outpatient regimen — testimony that was essentially unrebutted — supports the

---

[34] The magistrate judge also found that Mark's "aggressive and provocative demeanor could easily provoke a stranger to harm him." In its brief the State proposes other hypothetical victims, suggesting that if Mark continues to expose himself in public he could cause "mental and emotional trauma to others," particularly children. We have not yet decided whether "mental and emotional" injury to others satisfies the "harm" requirement of AS 47.30.730(a)(1), nor have we decided whether violence that a respondent's condition may provoke in others justifies committing the respondent. We need not address these issues now.

magistrate judge's finding that there was no less restrictive alternative to the requested 30-day commitment, and we see no clear error in that finding.[35]

Our conclusion in this case parallels our decision in *In re Joan K.* In that case, too, the respondent argued that the trial court erred when it ruled out outpatient treatment or a home placement, "particularly in light of [the testifying physicians'] decisions not to contact her family or prior psychiatrist to ask about [the respondent's] potential success in such alternative settings."[36] We pointed out that the superior court *did* hear testimony from the treating physicians that the respondent needed reliably-administered medications to bring her manic symptoms under control; that constant surveillance and care were necessary to ensure the success of this regimen; and that the respondent's "changeable emotions" and lack of insight into her own behavior made it very unlikely that "she would follow through with outpatient treatment even if she said she would."[37] We held this evidence sufficient to support the superior court's finding that there was no less restrictive alternative that would adequately protect both the respondent and the public.[38] On a similar record, we reach the same conclusion here.

## V. CONCLUSION

We AFFIRM the decision of the superior court granting the 30-day commitment petition.

---

[35] While the magistrate judge did not expressly state the standard of proof she applied to the issue of whether there was a less restrictive alternative, the one-sided nature of the medical evidence in this case makes it unnecessary for us to remand for reconsideration in light of the "clear and convincing evidence" standard we expressly apply to the issue today.

[36] *In re Joan K.*, 273 P.3d 594, 601 (Alaska 2012).

[37] *Id.* at 602.

[38] *Id.*