*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) )  Supreme Court No. S-17438 |
| | ) |
| VERN H. | )  Superior Court No. 1SI-19-00016 PR |
| | ) |
| | )  O P I N I O N |
| | ) |
| | )  No. 7531 – May 14, 2021 |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Trevor Stephens, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Vern H. Anna Jay, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

WINFREE, Justice.
BOLGER, Chief Justice, concurring.

## I.  INTRODUCTION

This appeal raises two questions about involuntarily detaining an individual in jail pending transport to a hospital for a civil commitment mental health evaluation. First, when transport is not immediately available and the individual requests a review hearing, what standard of proof applies to the individual's continued detention? Second, is the State required to show, by clear and convincing evidence, that jail is the least

restrictive alternative available for the detention? We hold that the probable cause standard applies to review hearings regarding an individual's continued detention, and we hold that the State must prove detention in jail is the least restrictive alternative available while an individual awaits transport to a hospital for evaluation.

## II.    FACTS AND PROCEEDINGS

On March 18, 2019, an attorney representing Vern H.[1] in an unrelated matter petitioned the Sitka superior court for an order authorizing Vern's hospitalization for a mental health evaluation.[2] The attorney indicated that Vern had said he needed to go to a behavioral health unit and threatened to hang himself. The attorney believed Vern was mentally ill and likely to cause harm to himself.

On March 19 the superior court ordered a screening investigation.[3] The court authorized both Sitka Counseling and Prevention and Southeast Alaska Regional Health Corporation - Clinic II (SEARHC) to conduct the screening investigation, noting that "if necessary, the investigating agency may seek the assistance of law enforcement to interview the respondent." The court ordered that the screening investigation report be filed no later than March 20.

Also on March 19 the Sitka police filed a notice stating that Vern had been taken into emergency detention at the Sitka jail on the night of March 18 and requesting

---

[1]        We use a pseudonym to protect Vern's privacy.

[2]        *See* AS 47.30.700 (permitting any adult to petition for ex parte order for mental health evaluation of individual who is "reasonably believed to present a likelihood of serious harm to self or others or is gravely disabled as a result of mental illness").

[3]        *See* AS 47.30.700(a) (requiring court to conduct or order screening investigation upon receiving petition for mental health evaluation).

a mental health evaluation for him.[4] The notice included statements indicating that Vern had made several calls to the police department threatening to kill himself and others; that he was experiencing delusions, including his legs being made of plastic; and that probable cause existed to support the assertion that Vern was mentally ill and as a result likely to cause serious harm to himself and others.

Also on March 19 a Sitka Counseling licensed social worker petitioned the superior court for an order authorizing Vern's hospitalization for evaluation.[5] The social worker stated that she had interviewed Vern at the Sitka jail that morning and that he posed a substantial risk of harm to himself. She noted that Vern "present[ed] with a mental impairment negatively impacting his ability to exercise conscious control of his actions, as evidenced by delusional thoughts and statements." She also noted that Vern had made threats to the police department about hanging himself and that he had told her: "I don't want to live the way I'm living." She indicated Sitka Counseling had confirmed that Alaska Psychiatric Institute (API) in Anchorage and Bartlett Regional Hospital in Juneau had capacity to see Vern in the next 24 hours.

---

[4] *See* AS 47.30.705(a) (permitting, among others, peace officer "who has probable cause to believe that a person is gravely disabled or is suffering from mental illness and is likely to cause serious harm to self or others . . . [to] cause the person to be taken into custody and delivered to the nearest . . . evaluation facility" under certain circumstances).

[5] *See* AS 47.30.710 (requiring mental health professional to perform emergency examination within 24 hours of respondent's detention under AS 47.30.705 and to apply for ex parte order authorizing hospitalization for evaluation under AS 47.30.700 if one has not yet been obtained); *see also In re Hospitalization of Gabriel C.*, 324 P.3d 835, 837 (Alaska 2014) (noting that "[a]fter a person is detained by a police officer and brought to an evaluation facility, a physician and a mental health professional must conduct an emergency evaluation within 24 hours" and that "[i]f warranted, the mental health professional may apply for an ex parte order authorizing hospitalization for a full evaluation").

That same day the superior court authorized Vern's hospitalization for evaluation.[6] The court found probable cause to conclude that Vern was likely to cause harm to himself. The court noted threats of suicide Vern made to the police department; collateral reports of his erratic behavior, including "suicidal ideation and delusional claims of persecution"; and his statements to the social worker, including: "I don't want to live the way I'm living." The superior court stated in its order:

> The respondent is not [to] be held at the Sitka jail, except for protective custody purposes. If the respondent has already been transferred to or is being detained in the Sitka jail, he shall be transported to SEARHC unless SEARHC believes a justification of protective custody exists[; i]f SEARHC believes a justification of protective custody exists, then SEARHC shall provide a detailed statement, sworn under oath, as to the facts and circumstances that make it necessary for the respondent to be held in the Sitka jail. This statement must be filed with the court prior to or immediately after [Vern's] detention in the Sitka jail.

On March 20 the State filed a status report stating that Vern's information had been sent to Bartlett Regional Hospital. The State indicated that Vern would not be transported to Juneau — and, implicitly, would remain in jail — until Bartlett Regional Hospital accepted him as a patient.

That same day Vern filed an unopposed expedited motion for a review hearing, stating that as a civil detainee without a pending criminal case his "restraint in a correctional setting justifie[d] immediate review" by the superior court. By then Vern had spent nearly three days in the Sitka jail. Vern contended that "he no longer [met] the

---

[6]     *See* AS 47.30.700(a) (permitting court to grant ex parte order for hospitalization for mental health evaluation upon showing of probable cause that "respondent is mentally ill and that condition causes the respondent to be gravely disabled or to present a likelihood of serious harm to self or others").

criteria for involuntary detention and/or commitment and that he should be released." Vern alternatively sought "immediate physical and mental evaluation to determine whether continued detention [was] warranted" or if "a less restrictive environment" could meet his "treatment needs."

Vern argued that his continued detention in a "penal setting" required review under a clear and convincing evidence standard, not the probable cause standard that had applied to the initial order authorizing his hospitalization for evaluation. Vern also asked that the State be required to prove by clear and convincing evidence that no less restrictive alternative to confinement in a penal setting existed while he awaited transport to the hospital for evaluation.

The State did not oppose Vern's hearing request — it agreed that a review hearing was consistent with our *In re Hospitalization of Gabriel C.* statement that the court should take "appropriate action" when an individual is detained awaiting transport to an evaluation facility.[7] But the State asserted that the appropriate standard for establishing the need for continued detention pending transport to an evaluation facility is probable cause. The State also indicated it had asked SEARHC to have someone appear to "explain why [Vern] cannot be held there pending transport." The court set a review hearing for March 21.

At the hearing Vern was represented by the Public Defender Agency, and an Assistant Attorney General appeared for the State. Both Vern and the Sitka Counseling social worker testified. Despite the superior court's previous order, the record before us does not contain a sworn statement from SEARHC about its ability or

---

[7] *See* 324 P.3d at 838 ("[W]e take this opportunity to stress that the assigned judicial officer should not hesitate to take appropriate action to expedite an evaluation if the respondent cannot be transported to the initially designated facility without delay.").

willingness to admit Vern pending transport to an evaluation facility, and the hearing transcript reflects that no SEARHC representative participated in the hearing. At one point the State's attorney said that "ideally [Vern] would be at [SEARHC], and I was hoping to get an explanation as to why that's not possible in this case."

The social worker testified that she had been meeting daily with Vern at the jail. She stated that in her initial assessment she had "asked him questions about the circumstances of his arrest[] and assessed whether . . . he was going to be able to maintain his own safety and the safety of others on his own or whether [commitment] criteria [were] met." She stated her belief that Vern had a mental illness was based on his: (1) statements regarding self harm, including, "I would only hurt myself if I was stopping myself [sic] from hurting someone else," and "if I wanted to die I could do it right now and take myself out with just my hands"; (2) rapidly fluctuating affect, which she described as "intermittently very agitated and intermittently rageful"; (3) "[g]eneral motor agitation"; and (4) delusional statements regarding his own health. She said she believed Vern's mental illness would cause him to pose a danger to himself if he were released from detention. She stated that she understood Vern was not taking any psychiatric medications, that by his own reports he had not been receiving treatment, and that he did not appear to have any social supports. She said that she did not think Vern posed a danger to others and that she "ha[d] no stake in" whether, pending the mental health evaluation, Vern was in jail as opposed to a hospital. On cross-examination she acknowledged having no information whether Vern had attempted to harm himself since the original petition was filed.

The superior court questioned the social worker about why Vern could not be held at SEARHC pending transport to Bartlett Regional Hospital. The social worker stated her general understanding that in Sitka an individual jailed pending a mental health evaluation generally remains jailed unless "medical necessity" requires transport to

SEARHC. The court then, expressly directing the question to the State's attorney, asked why Vern was not at SEARHC. The State's attorney said that he had contacted SEARHC and was advised someone would call in to the hearing, presumably to discuss why Vern could not be held there. Acknowledging that he could not provide testimony on the issue, the State's attorney said a SEARHC doctor indicated that if Vern were homicidal he would not be admitted. The State's attorney concluded that although having Vern held in a medical setting pending transport would be preferable, it could not "force SEARHC to take him."

Vern testified and was questioned by the superior court, the State's attorney, and his own attorney. He testified that his statements to the social worker and others regarding his health had not been delusions because he had undergone cancer treatment in Fairbanks. He asserted that he recently had been prescribed psychotropic medication but that he had been unable to access medication in jail. He stated that he needed mental health treatment and that he had been attempting to secure outpatient counseling. He agreed that a court order to attend outpatient treatment "probably would not be a bad idea." He denied that his statements such as "I don't like living like this" were indicative of plans to harm himself. He argued that being held in jail prior to transport for evaluation was counterproductive, because "you don't throw a guy that has hard times on a concrete floor and tell him he's no good," and that the social worker was "just . . . digging at me and digging at me and trying to get me to go off."

After the evidentiary presentation, the State argued that there was probable cause to believe Vern would likely harm himself if released and that, although ideally he would have been held in a medical setting pending transport for evaluation, his delay in jail was permissible under *In re Gabriel C.* Vern's attorney responded that even under a probable cause standard the evidence regarding Vern's mental illness and likelihood

he would harm himself did not meet the statutory threshold.[8] She also suggested that the court could continue with the case but order that Vern not be held in jail.

The superior court concluded there was probable cause to find Vern suffered from a mental illness, as evidenced by his numerous suicidal statements and apparent recent decompensation. The court also concluded that there was an established likelihood of Vern harming himself. The court concluded that protective custody was necessary and observed that being held in jail was "not therapeutic" but was "necessary to protect [Vern]."

The superior court issued a written order indicating that its previous hospitalization authorization for Vern's evaluation remained in effect and that Vern could continue to be detained in the Sitka jail because "the record reflects that [Vern] has no social supports in the community and SEARHC . . . is presently not willing to have him stay there pending transport to the nearest available evaluation facility." But the court ordered that Vern be monitored daily by qualified personnel and be released if at any point he did not meet detention criteria. The court ordered the State to file a status report the next day updating SEARHC's willingness to admit Vern pending transport. The court ordered the State and Sitka Counseling to continue making diligent efforts to secure Vern's admission to an evaluation facility. And the court scheduled another review hearing for the next business day, March 26.

On March 22 the State filed a status report indicating that Bartlett Regional Hospital had accepted Vern for evaluation. The State also indicated that it had not contacted SEARHC since the court's March 21 order. Vern was transported to Juneau that same day and admitted for evaluation. Vern was released on March 25 after Bartlett

---

[8]    *Cf.* AS 47.30.915(11), (14) (defining "least restrictive alternative" and "mental illness").

Regional Hospital's personnel determined he no longer met hospitalization or commitment criteria.

Vern appeals, asking us to vacate the March 21 order authorizing his continued protective custody in Sikta jail pending transport for evaluation.[9]

## III. STANDARD OF REVIEW

We review factual findings in involuntary commitment proceedings for clear error, and we overturn such findings only if a review of the record generates "a definite and firm conviction that a mistake has been made."[10] Whether factual findings comport with statutory requirements presents a legal issue that we review de novo.[11] Constitutional issues and questions of statutory interpretation are questions of law to which we "appl[y our] independent judgment."[12] "When reviewing questions of law,

---

[9] Appeal of an order authorizing detention and hospitalization for psychiatric purposes generally is subject to the public interest exception of the mootness doctrine, whether the appeal is premised on a question of statutory or constitutional interpretation or on an evidence-based challenge. *In re Hospitalization of Naomi B.*, 435 P.3d 918, 930 n.60 (Alaska 2019) ("We hold today that regardless of the type of involuntary admission or medication proceeding being challenged or the legal basis for appeal, the public interest exception authorizes us to consider any such appeal on the merits."); *see also In re Hospitalization of Daniel G.*, 320 P.3d 262, 268 (Alaska 2014) (holding public interest exception to mootness applied to appeal of ex parte order authorizing up to 72 hours confinement for psychiatric evaluation pursuant to AS 47.30.715).

[10] *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1191 (Alaska 2013) (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375 (Alaska 2007) *overruled on other grounds by In re Naomi B.*, 435 P.3d at 918).

[11] *Id.*

[12] *In re Hospitalization of Paige M.*, 433 P.3d 1182, 1186 (Alaska 2018) (quoting *In re Hospitalization of Heather R.*, 366 P.3d 530, 531-32 (Alaska 2016)).

[we] adopt[] 'the rule of law most persuasive in light of precedent, reason, and policy.' "[13]

## IV. DISCUSSION

### A. Probable Cause Standard At The Review Hearing

The due process clauses of the United States Constitution and the Alaska Constitution prohibit the State from depriving an individual of liberty without due process of law.[14]  The emergency detention of an individual while awaiting evaluation at a hospital implicates due process protections.[15]  In assessing procedural due process claims, we apply the *Mathews v. Eldridge* test:[16]

> [D]ue process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[17]

Vern asserts that the superior court erred by applying the probable cause standard at the review hearing because due process mandates that the clear and convincing evidence standard apply.  He argues that the court should have used the clear

---

[13]    *Id.* (quoting *In re Heather R.*, 366 P.3d at 532).

[14]    U.S. Const. art. XIV, § 1; Alaska Const. art. 1, § 7.

[15]    *In re Hospitalization of Daniel G.*, 320 P.3d 262, 269 (Alaska 2014).

[16]    *Id.* at 270 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

[17]    *Mathews*, 424 U.S. at 334-35; *see also id.* at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))).

and convincing evidence standard because he was being held in a "punitive facility" and his detention had already exceeded 72 hours.[18]  The State responds that although Vern's interest in being free from detention was significant, the risk of an erroneous deprivation of that interest with the probable cause standard was low given procedural protections already in place.  The State also contends that it has an interest in "protecting vulnerable people from harming themselves, protecting society from people who are dangerous to others, providing appropriate treatment for people who are mentally ill and in need of care, and more generally, properly administering the civil commitment statutes."

An individual detained by court order but not yet transported to a hospital for a full evaluation has an important liberty interest at stake.  But, as both Vern and the State recognize, potential liberty curtailment is not as great an interest at the review stage as at the involuntary commitment hearing.[19]  Risk of erroneous deprivation is low because several procedural protections attach after an individual is detained for an evaluation.[20]  And using the clear and convincing evidence standard would be inconsistent with the purpose of a review hearing:  determining whether cause exists for detention pending hospitalization for a medical evaluation of whether a person is in need of mental health treatment.  As the State points out, using the clear and convincing evidence standard could create a revolving door in which a respondent is released at the

---

[18]  Vern argues that he should be afforded greater due process protections because the 72-hour statutory limit for evaluations already had expired.  But, as explained below, the time limit had not expired because it does not begin to run until an individual is transported to a hospital for evaluation.  *See In re Gabriel C.*, 324 P.3d 835, 837-38 (Alaska 2014).

[19]  *See* AS 47.30.735(c) (requiring proof by clear and convincing evidence before court can commit individual to treatment facility for up to 30 days).

[20]  *See* AS 47.30.725 (providing rights of respondent detained for evaluation).

review hearing stage because the heightened standard cannot be met without evidence from the requested evaluation, only to have another ex parte petition filed and the respondent again detained based on probable cause. Finally, the State has a clear interest in protecting the welfare and safety of its citizens at the review hearing stage.

Weighing these considerations, we conclude that a review hearing is more similar to the initial determination whether the respondent should be involuntarily hospitalized for evaluation than to an involuntary commitment hearing. And to the extent a respondent's liberty interest is greater at the review hearing than at the initial determination because of the extended time the respondent has been detained, the additional procedural protections afforded by AS 47.30.725 adequately alleviate the risk of a greater deprivation. We therefore conclude that due process requires only that courts apply the probable cause standard at review hearings, not the clear and convincing evidence standard.[21] The fact that Vern was held in jail rather than a hospital does not alter this analysis; the detention location is relevant only to whether it is the least restrictive available alternative.

### B.    Least Restrictive Alternative

Alaska Statute 47.30.705(a) provides, in relevant part: "A person taken into custody for emergency evaluation may not be placed in a jail or other correctional facility except for protective custody purposes and only while awaiting transportation to a . . . treatment facility." Although some of our previous cases have involved individuals

---

[21]    To the extent Vern argues that evidence presented at the review hearing did not satisfy the probable cause standard, we disagree. Adequate evidence before the superior court supported a finding of probable cause that Vern was suffering from a mental illness and that he presented a likelihood of harm to himself. *See supra* pp. 5-8.

detained in jail while awaiting evaluation,[22] we have not considered the meaning of AS 47.43.705(a)'s prohibitions.

Vern and the State agree that the definition of protective custody is relevant to considering whether AS 47.43.705(a) was properly applied, and the parties point to Black's Law Dictionary's protective custody definition: "The government's confinement of a person for that person's own security or well-being, such as a witness whose safety is in jeopardy or an incompetent person who may harm him- or herself or others."[23] Although this is a useful starting point, the meaning of protective custody also must be understood in light of legislative policies underlying Title 47 of Alaska Statutes.[24] The legislature explicitly adopted several policy principles during its 1981 revisions to Title 47.[25] Among these principles is that "persons be treated in the least restrictive alternative environment consistent with their treatment needs."[26]

We previously have held that this policy requires courts to find, by clear and convincing evidence, that involuntary commitment is the least restrictive alternative

---

[22] *See, e.g.*, *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1186 (Alaska 2013) (noting that for logistical reasons respondent remained in Haines jail for six days before being transported to Juneau for evaluation).

[23] *Protective Custody*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[24] Title 47 contains statutes relating to welfare, social services, and related institutions. *See* AS 47.05.010-47.90.070.

[25] AS 47.30.655 (explaining purpose of 1981 revisions was "to more adequately protect the legal rights of persons suffering from mental illness" and noting principles that guided revision).

[26] AS 47.30.655(2); *see also In re Hospitalization of Mark V.*, 375 P.3d 51, 57 (Alaska 2016), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019).

available to the individual.[27] The least restrictive alternative is "no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and "involve[s] no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury."[28] This policy also applies to protective custody while awaiting transport for evaluation.[29] We conclude that an individual may be jailed while awaiting transport to a hospital only if the State shows by clear and convincing evidence that jail is the least restrictive available alternative.[30]

The State argues that no less restrictive alternative to jail was available for Vern. Vern argues that detention in jail was not the least restrictive option because the State could "have detained Vern at SEARHC" and because the State did not adequately explore creative solutions such as a hotel room with a nurse and security guard or a halfway house where mental health professionals could visit him. We consider only the possibility that SEARHC was a less restrictive alternative than jail because the parties

---

[27] *In re Mark V.*, 375 P.3d at 57-58.

[28] *Id.* at 57 (quoting AS 47.30.915(11)).

[29] We note that "least restrictive alternatives" are options providing some form of treatment. *See* AS 47.30.915(11). But conditions necessary to protect a respondent awaiting evaluation are "conditions of treatment" because they guarantee the respondent eventually will receive the formal medical treatment and care needed. Protective custody therefore is a least restrictive alternative option so long as custody is necessary for the respondent's protection.

[30] The State need only consider alternatives that are feasible and would satisfy the State's interests in protecting respondents and the public. *Cf. Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 185 (Alaska 2009) ("Although the state cannot intrude on a fundamental right where there is a less intrusive alternative, the alternative must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action.").

and superior court considered that possibility; Vern did not raise the possibility of additional creative solutions in the superior court, raising only the possibility of simply releasing him from jail to await transport.[31]

The superior court sought to ensure that Vern was detained in jail only if it was the least restrictive alternative available. When the court authorized Vern's hospitalization, it ordered that he not be held at the Sitka jail but rather be transported to SEARHC unless SEARHC responded that justification of protective custody in jail existed. The court also ordered: "SEARHC shall provide a detailed statement, sworn under oath, as to the facts and circumstances that make it necessary for [Vern] to be held in the Sitka jail. This statement must be filed with the court prior to or immediately after [Vern's] detention in the Sitka jail." But SEARHC was not a party to the case.

It is the State's burden to prove that detention is in the least restrictive available setting, and the State thus was required to obtain the evidence showing that SEARHC was not available for Vern's detention. The State could have collaborated with SEARHC to obtain a satisfactory affidavit or subpoenaed SEARHC to require a representative to testify at the hearing. The State did neither. There thus is scant evidentiary support for the superior court's March 21 finding that SEARHC "is presently not willing to have him stay there pending transport to the nearest available evaluation facility." There was no evidence of SEARHC's specific position on admitting Vern;

---

[31]     The State is not required to prove the unavailability of every imaginable alternative, but if an alternative is proposed by the superior court, as in this case, or by the respondent, it is at minimum the State's burden to prove the proposed alternative is inadequate. *Cf. In re Luciano G.*, 450 P.3d 1258, 1264-65 (Alaska 2019) (rejecting petitioner's argument that "the evidence was insufficient to show what alternatives to confinement were considered and by whom, or why a less restrictive alternative was not viable" because testimonial evidence supported superior court's conclusion that respondent "did not appear to have anywhere to stay and was unlikely to follow up with treatment if not committed").

there was evidence only of the social worker's general understanding of SEARHC's practice regarding detaining respondents pending transport for hospital evaluation. This is not clear and convincing evidence that SEARHC would not admit Vern pending transport.[32]

The Sitka Counseling social worker explicitly testified that she did not believe Vern had any social supports. Given the evidence actually produced at the hearing, this supported the superior court's rejection of simply releasing Vern and left only the jail as the immediately available least restrictive alternative for his protection while he was detained awaiting transport. The court correctly ordered the State to again communicate with SEARHC about holding Vern pending transport and to put that information in a status report due the next day. Given the expedited timing of the review hearing and the facts and circumstances of this case, the court's continuing order that the State seek a less restrictive alternative to the jail rendered any factual error by the court harmless. The remedy for the State's failure to follow the court's direction about obtaining evidence of SEARHC's availability as a less restrictive alternative to jail is not a reversal of the court's March 21 detention order.

### D. Vern's Remaining Arguments

Vern's other arguments are foreclosed by our precedent. His remaining statutory argument fails; we held in *Gabriel C.* that the 72-hour evaluation period in AS 47.30.715 begins running on an individual's arrival at an evaluation facility, not when first detained.[33] Vern's detention in jail therefore did not violate the 72-hour evaluation period. As to Vern's substantive due process claim, we recently held that a

---

[32]  *Cf. In re Mark V.*, 375 P.3d at 58 ("[The State] must prove, by clear and convincing evidence, the petition's allegation that there are no less restrictive alternatives.").

[33]  324 P.3d 835, 837-38 (Alaska 2014).

substantive due process violation occurs in this context when a person has been held for an unreasonable period of time awaiting a 72-hour evaluation.[34] Vern was held awaiting transport for approximately four days, and we see no substantive due process violation under the facts and circumstances of his detention.

## V.    CONCLUSION

We AFFIRM the superior court's March 21, 2020 review hearing order.

---

[34]    *In re Mabel B. & Sarah D.*, ___ P.3d ___ Op. No. 7525, 2021 WL _____ (Alaska May 7, 2021) (holding that 17 and 18 day holds in medical facilities while awaiting 72-hour evaluation bore no reasonable relation to evaluative purpose of hold and therefore violated substantive due process).

BOLGER, Chief Justice, concurring.

I agree with this court's decision to affirm the superior court's order following the review hearing. But I disagree with the suggestions that the superior court made a "factual error" because there was "no evidence" that SEARHC would not accept Vern pending transport. I believe that it would have been counterproductive to require this undisputed fact to be established by clear and convincing evidence at an expedited hearing scheduled with less than 24-hours' notice.

Vern was taken into emergency detention by a Sitka Police Department officer after he made numerous calls to the department threatening to kill himself. He also made death threats to a local pastor and "a staff member at SEARHC." A social worker from a local counseling center examined Vern the following day and requested a mental health evaluation, based in part on reports of "homicidal statements" from the pastor and a SEARHC staff member.

The superior court relied on these "homicidal statements" when it ordered the State to transport Vern to Bartlett Regional Hospital for evaluation. But the order also required Vern to be transported to SEARHC unless the hospital provided a statement detailing why it was necessary for him to be held at the Sitka jail. The order more generally required the State to ensure that "no less restrictive alternatives" were available for Vern's detention. The court also provided that the order for evaluation would expire within seven days unless Vern had been transported to an evaluation facility or held at a medical facility awaiting transport.

Vern requested an expedited review hearing, and the court scheduled a hearing for the following day. Neither the judge nor counsel for either party was present in Sitka; out-of-town participants were authorized to appear by telephone.

Immediately before the hearing, the State's attorney filed a response to Vern's request. The attorney stated that he had spoken to a doctor at SEARHC and

-18-                                                                        **7531**

requested that someone from SEARHC appear at the hearing to explain why Vern could not be held there pending transport. At the hearing, the attorney explained that the doctor indicated that the hospital "did not want to take" Vern "because of . . . indications that he . . . might be homicidal." And the doctor also indicated that "someone would call into the hearing and explain that."[1] I believe the attorney's explanation was an adequate response to the court's previous orders at an expedited telephonic hearing scheduled with less than a day's notice.

It is true that we have encouraged judicial officers "to take appropriate action to *expedite an evaluation* if the respondent cannot be transported to the initially designated facility without delay."[2] But we have declined to require a due process hearing prior to an evaluation order because the delay to schedule a formal hearing could result in a longer detention than required for the evaluation itself.[3] We should not here establish a pre-evaluation procedural requirement that could actually result in longer pre-evaluation detention.

In this case, the State's attorney was obviously unprepared to present formal proof that SEARHC was unavailable when the doctor unexpectedly failed to appear or remain on the line at the telephonic hearing. The superior court dealt with this situation by continuing the order that Vern was to be transported to SEARHC whenever it was willing to accept him. Fortunately, Vern was instead transported for evaluation

---

[1]     The court clerk indicated that someone had joined the telephonic hearing, "but then they dropped right off." Neither party asked the judge to clarify exactly who had been on the line.

[2]     *In re Hospitalization of Gabriel C.*, 324 P.3d 835, 838 (Alaska 2014) (emphasis added).

[3]     *In re Hospitalization of Daniel G.*, 320 P.3d 262, 273 (Alaska 2014).

at Bartlett the day after the hearing. And Vern was released following his evaluation, a day before the next scheduled review.

I believe the superior court's orders were appropriate. The evaluation order required the State to arrange for Vern's immediate transport to the first available bed at Bartlett. It appears that Vern was indeed transported to Bartlett three days later when the first bed became available. Pending transport, the State was required to file daily reports to ensure that no less restrictive alternative placement was available.

But as the court's opinion implies, to present clear and convincing evidence that SEARHC would not accept Vern would have required the State to identify and subpoena a witness for testimony when all parties could be available. In an urban location, the State might be required to prepare and present several witnesses from various alternative placements. If the respondent is entitled to a pre-evaluation hearing on this topic, then the superior court will need to allow the parties sufficient time to prepare for the hearing. In my opinion, this preparation could easily take more time then the evaluation itself.

In this case, the superior court sought to prevent excessive detention by setting the evaluation order to expire within seven days unless Vern was transported to a medical facility. In view of this backstop, I see no error in the court's decision to accept the State's representations about SEARHC's position at this expedited hearing.