*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| In the Matter of the Necessity of the Hospitalization of | ) ) ) | Supreme Court No. S-18219 |
| DECLAN P. | ) ) | Superior Court No. 3PA-21-00620 PR |
| | ) ) | O P I N I O N |
| | ) ) | No. 7670 – November 9, 2023 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

Appearances: Sharon Barr, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Declan P. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I.     INTRODUCTION

A man with a bipolar diagnosis stopped taking his medication, experienced a manic episode, and as a result was hospitalized. Hospital staff petitioned to have him involuntarily committed for 30 days. After a hearing the superior court granted the petition. The man appeals, arguing that the superior court erred by

determining he was likely to cause harm to others; he was gravely disabled; and there was no less restrictive alternative to involuntary commitment.

Applying our recent decision in *In re Hospitalization of Sergio F.*,[1] we hold that the man's rights were violated because there was a feasible, less restrictive alternative treatment to involuntary commitment. Further, even assuming the identified outpatient treatment proposal was not feasible, the State failed to meet its burden of proving that no less restrictive alternative existed because it did not consider any additional treatment options beyond the man's proposal. We vacate the commitment order on these grounds.

## II.   FACTS AND PROCEEDINGS

### A.   Declan P. Is Detained And Held For Evaluation; The State Petitions For Involuntary Commitment.

In September 2021 in Anchorage, police observed Declan P.[2] dancing in the street with cars driving around him. He had cuts on his feet and a bloody nose, and told the police to kill him and that he wanted to be killed. Declan was taken into emergency custody and delivered to the Alaska Native Medical Center. The superior court issued an order authorizing hospitalization for evaluation. Declan was transferred to Mat-Su Regional Medical Center (Mat-Su Regional) the following day.

Three days later, providers at Mat-Su Regional filed a petition for 30-day involuntary commitment. The petition alleged Declan was mentally ill, likely to cause harm to himself or others, and gravely disabled. It noted Declan's "history of bipolar disorder" and stated he exhibited "delusional" thinking and was "paranoid of being drugged by hospital staff and sexually assaulted outside the hospital." The petition asserted Declan had been "minimally cooperative with treatment" and "refused

---

[1]   *In re Hospitalization of Sergio F.*, 529 P.3d 74 (Alaska 2023).

[2]   We use a pseudonym to protect Declan P.'s privacy.

medications."  A separate petition was filed seeking approval to involuntarily administer psychotropic medication.

### B. The Superior Court Holds A 30-Day Commitment Hearing.

A hearing on the petitions was held on September 16 before a superior court master.  Five witnesses testified at the commitment hearing:  Declan's longtime outpatient provider; Declan's neighbor; a psychiatric nurse practitioner who testified as the State's expert witness; Declan; and a court visitor who testified regarding the involuntary medication petition, which the State ultimately withdrew.

#### 1. Testimony

##### a. Testimony about Declan's mental health history

Testimony established that Declan had previously been hospitalized at the Alaska Psychiatric Institute (API) in 2014, where he was diagnosed with bipolar disorder.  Since that time Declan had returned to full-time work, successfully lived independently, and participated in ongoing psychiatric treatment, including consistently taking medication since at least 2015.  Declan's longtime outpatient provider testified Declan had been "stable" for the past six years while on medication.

##### b. Declan's neighbor

Declan's neighbor, an attorney, testified that he had known Declan since 2015 and had worked with him on various legal issues.  The neighbor testified he sees Declan regularly; that he lives five minutes from Declan's home; and that Declan had been stable since 2015.  He described Declan as "fully functional," "100% stable," and "competent" at all times while on medication.  The neighbor stated he trusts Declan and that Declan assured him he would take his medication if released.  The neighbor further stated: "I would . . . go to [Declan]'s house three times a day . . . and check on [Declan] and report . . . if [Declan]'s not acting normal.  I'd be happy to even pick [Declan] up at the hospital upon discharge and . . . drive him to his house and make sure he's safe and operative."  The neighbor reiterated he would make sure Declan took his medication and would call the police department if he did not.

### c. The State's expert witness

Next a psychiatric nurse practitioner, who was also one of Declan's treatment providers at Mat-Su Regional, testified for the State. The superior court master qualified her as an expert in psychiatry. The expert had evaluated Declan and spoken with him daily. She asserted Declan's diagnosis was bipolar disorder, based on symptoms including "irritable mood state, decreased sleep, high energy, risky and impulsive behavior," and psychosis. She stated that Declan appeared to be suffering from paranoia and delusions manifesting in beliefs that hospital staff were drugging him and would possibly murder or sexually assault him.

The expert testified as to each of the required findings for involuntary commitment. First, she stated "there is a risk" that Declan was still likely to cause serious harm to himself or others. She identified two main incidents of concern: a statement made by Declan regarding violence and an elopement from the hospital followed by suspected property damage. She explained that when she had mentioned getting records from Declan's prior hospitalization, he expressed frustration and stated, "I can't be violent without killing people." She later testified this was "merely a statement," and that Declan did not attempt to harm her or other staff.

The expert then testified Declan "eloped from the unit" at around 4:00 a.m. on the day before the hearing. She stated she believed Declan was picked up by police a couple hours later and returned to the hospital. She testified it was her understanding that Declan broke somebody's car window.[3] She stated Declan had not made any threats toward anyone else and had not attempted to harm anyone in the hospital.

---

[3] On cross-examination, the treatment provider stated: "I think there was concern about him being violent against a car of somebody who was going to help him and he broke their window out."

Second, the expert testified she believed Declan continued to be gravely disabled because he was "fearful that [the hospital staff] were going to sexually assault him, drug him, murder him. He . . . screamed rape when nothing was happening, no one was near him . . . . He seems to be paranoid that others are out to get him." She stated Declan had been involuntarily medicated while at Mat-Su Regional. According to the expert, Declan's behavior — including elopement and delusions — continued to be "a substantial deterioration from his previous ability to function independently" as a result of "[l]ikely not taking his psychiatric medications." She also testified Declan had been "intermittently [taking] medications voluntarily" at the hospital.

The expert acknowledged that Declan was doing "significantly better" at the time of the hearing than the previous day and that his thinking was "clearer" and had "improved." She testified Declan stated his willingness to take his medication, but wanted "to vary his dose." She testified Declan appeared to be eating well, staying hydrated, and was adequately dressed.

Third, she testified there was no less restrictive alternative to inpatient treatment because Declan "continues to show impaired judgment." She stated: "I think that [Declan] needs to get stabilized on his medications before he can be safe in the community." However, she also testified that "if [Declan is] willing to take [his medication] every day, same dose" he would likely continue to stabilize and remain that way, and that this could be done on an outpatient basis.

#### d.    Declan's testimony

Declan testified that if released from the hospital he had a house to go to, and his neighbor could pick him up and drive him to his house. Declan stated he had no desire, intention, or plans to cause harm to anyone, either at the time of the hearing or after release. Declan acknowledged that the event that led to his hospitalization was preceded by a failure to take his medication, but repeatedly stated that his intention moving forward was to take medications as prescribed. Declan testified he no longer felt that the hospital was going to rape, murder, or drug him, stating, "I understand now

-5-                                        7670

that it's not a threat." But he also asserted he had "good reasons for believing" those things at the time.

### 2. The superior court master's oral findings and conclusions approving involuntary commitment

The superior court master found that Declan was suffering from a mental illness — bipolar disorder — and was experiencing a manic episode. The master found "there has been some improvement," and that "[Declan] is doing better today," but that the 30-day commitment was necessary because "ongoing hospitalization is still needed."

The master found that Declan was likely to cause harm to others and was gravely disabled. The master explained Declan appeared to have a "very tenuous hold" on the recent improvement in his condition and that the master was not required to "take a snapshot of this moment," but rather look at the "ups and downs." The master found it was not likely that Declan was "going to follow through at this point." And although the master noted the treatment option of the neighbor providing help to Declan, the master concluded Declan was not ready to be released.

The master further found that Declan was "suffering from severe abnormal mental, emotional, and physical distress," and that although Declan had improved, he "cannot be released safely into the community quite yet" due to the recent elopement and the expert's testimony about Declan breaking a window. The master found that involuntary commitment was the least restrictive alternative, despite noting that Declan's outpatient treatment proposal was "a better outpatient option than I'm used to seeing." The master stated he hoped Declan could be released "in the next few days." The master did not consider any treatment alternatives beyond Declan's proposal.

### 3. The court visitor's testimony; the master reconsiders and then affirms his conclusions

Immediately following the involuntary commitment proceedings, the State called a court visitor to testify in support of the involuntary medication petition. Earlier that day the court visitor had spoken with Declan for about 20 minutes. The court visitor testified Declan was "competent to give or withhold informed consent" because he could "clearly describe why he was here" and could explain his situation "in ways that were clear and coherent." The court visitor stated Declan was not "delusional"; that he was "clear and concise" about his diagnosis and treatment protocol; and that he could have rational conversations.

The court visitor also explained Declan was "not objecting to medication," only expressing preferences about how it was delivered. For instance, the court visitor stated Declan prefers to take his medications throughout the day rather than all at once. The State then withdrew its petition for involuntary psychotropic medication because Declan was willing to take his medications.

Declan then asked the master to reconsider the involuntary commitment determination in light of the court visitor's testimony. Declan argued outpatient treatment would be appropriate because the testimony established that he was willing and likely to take his medications. The master briefly considered this argument, but concluded that he would not change his original finding. The master stated he had much more confidence in Declan following through on medication in the hospital compared to the outpatient option. Finally, based on Declan's "belief narrative" that led to elopement, the master found involuntary commitment was still needed.

### C. The Superior Court Authorizes A 30-Day Involuntary Commitment.

On September 16, 2021, the superior court issued a written order authorizing a 30-day involuntary commitment. The order stated Declan was likely to cause serious harm to others and was gravely disabled. The order also stated that Declan "is in a persistent paranoid state" that would "likely . . . escalate to physical violence."

The order concluded Declan was "suffering from severe delusions of imminent harm" and that "[h]is decisions in response to these fears put him at risk of harm through being unsafe in the community."

The court further found that Declan "still maintained the validity of his original paranoid fears," and that the "recent step forward" was unlikely to be "the end of his paranoid delusions and reluctance towards taking appropriate medication." The court found that "outpatient treatment is unlikely to adequately protect [Declan] and the public." It concluded there were no feasible, less restrictive alternatives to involuntary commitment.

Declan was released from the hospital four days later with no treatment plan or requirements for further supervision. He now appeals the 30-day commitment order, contending the superior court erred by concluding there was clear and convincing evidence he was likely to cause harm to others; he was gravely disabled; and there was no less restrictive alternative to involuntary commitment. We address only Declan's least restrictive alternative argument because it is dispositive.

## III.   STANDARD OF REVIEW

We review factual findings in involuntary commitment proceedings for clear error.[4] Whether those factual findings meet statutory standards for involuntary commitment is a question of law to which we apply our independent judgment.[5]

## IV.   DISCUSSION

We have "characterized involuntary commitment for a mental illness as a 'massive curtailment of liberty' that demands due process of law."[6] A court may issue an order committing an individual to a treatment facility for a 30-day period only if two

---

[4]    *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[5]    *Id.* at 923-24.

[6]    *Id.* at 931 (quoting *Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 375-76 (Alaska 2007), *overruled on other grounds by In re Naomi B.*, 435 P.3d 918).

conditions are established. First, the petitioner must prove, by clear and convincing evidence, that the respondent is (a) mentally ill and as a result is likely to cause harm to self or others or (b) is gravely disabled.[7] Second, the petitioner must establish by clear and convincing evidence that no feasible, less restrictive alternative to involuntary commitment is available.[8]

We have explained that "the trial court's deliberate consideration of [whether less restrictive alternatives exist] is critical to the protection of the respondent's liberty interests."[9] The least restrictive alternative means treatment facilities and conditions that "are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient."[10] A less restrictive alternative must also be feasible,[11] available,[12] and provide "adequate treatment" for a respondent.[13]

We recently addressed the least restrictive alternative requirement in *In re Hospitalization of Sergio F.*[14] There we vacated the commitment order, holding that the State failed to prove, by clear and convincing evidence, that no less restrictive

---

[7]    *Id.* (citing AS 47.30.735(c)).

[8]    *Id.* at 932.

[9]    *In re Hospitalization of Mark V.*, 375 P.3d 51, 58 (Alaska 2016), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 924-31 (Alaska 2019).

[10]    AS 47.30.915(14)(A)-(B) (providing that least restrictive alternative is treatment involving "no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection of the patient or others from physical injury").

[11]    *In re Naomi B.*, 435 P.3d at 932-33.

[12]    *Id*. at 933-34; *see also* AS 47.30.735(d).

[13]    *In re Hospitalization of Danielle B.*, 453 P.3d 200, 204 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 768 (Alaska 2016)).

[14]    529 P.3d 74 (Alaska 2023).

alternative to involuntary commitment existed.[15] We noted with disapproval that the State did not consider any additional treatment options beyond the respondent's proposed treatment plan.[16] We emphasized that "less restrictive alternatives to hospitalization in a secure, locked facility must be considered before ordering involuntary commitment and that it is the State's burden — not the respondent's contrary burden — to show that those alternatives do not exist or are not feasible."[17]

### A.    It Was Error To Find That Declan's Outpatient Treatment Proposal Was Not A Feasible, Less Restrictive Alternative.

The master noted that Declan's outpatient treatment proposal would include the support of both his longtime outpatient provider and his neighbor, stating this was a "better outpatient option than [he was] used to seeing." The superior court found that, given Declan's improvement, there was "a reasonable question as to whether out-patient treatment would now be sufficient." But the court nonetheless concluded "outpatient treatment is unlikely to adequately protect [Declan] and the public," finding that it was "unlikely that this recent step forward is the end of his paranoid delusions and reluctance towards taking appropriate medication."

Declan argues the finding that his outpatient treatment proposal was inadequate was clearly erroneous. Declan asserts he had been reliably taking medication for at least six years and was steadily stabilizing after resuming medication. Declan points out he was willing to continue taking medication; this was confirmed by the neighbor and the court visitor; and any alleged "reluctance" to take medication was the result of a misunderstanding about *how* the medication would be taken.[18] Declan

---

[15]    *Id*. at 80-82.

[16]    *Id*. at 80.

[17]    *Id*. at 82.

[18]    Declan expressed a preference to take his medication throughout the day, rather than in a single dose. The State provided no evidence to suggest this was an unreasonable or infeasible solution.

thus asserts he did not need to be hospitalized to continue taking medication and that his outpatient treatment proposal — returning to his house to take medications under the neighbor's supervision — was less restrictive and feasible.

Declan next distinguishes his situation from two prior cases: *In re Hospitalization of Connor J.*[19] and *In re Hospitalization of Luciano G.*[20] Declan argues that unlike the respondents in those cases, he was capable of living on his own and taking care of his basic needs; had insight into his mental illness; was willing and likely to take medication if released; had a stable housing situation; and had a neighbor who was willing to look after him and monitor his medication regimen.[21]

The State argues in response that the superior court properly found that Declan was unlikely to take medication if released and correctly concluded that involuntary commitment was the least restrictive treatment option. The State asserts Declan continued to be unstable, delusional, and reluctant to take his medication as prescribed. The State cites to the expert's testimony that Declan's medication required three to seven days to build up in his body and stabilize his condition and that Declan was not yet ready for outpatient treatment. Relying on *In re Hospitalization of Joan*

---

[19] 440 P.3d 159, 165-67 (Alaska 2019) (affirming involuntary commitment as least restrictive option where respondent had a pattern of anger and violence, would likely have been unable to meet many of his basic needs outside of an institution, and had refused medication).

[20] 450 P.3d 1258, 1264-65 (Alaska 2019) (affirming involuntary commitment as least restrictive option where respondent "did not appear to have anywhere to stay and was unlikely to follow up with treatment if not committed" because he lacked insight into his condition and believed he did not need treatment).

[21] *See id.* at 1261, 1264-65; *In re Connor J.*, 440 P.3d at 165-67.

-11- 7670

*K*.[22] and *In re Hospitalization of Mark V*.,[23] the State further argues that "involuntary hospitalization is the least restrictive alternative when it is necessary to ensure medication compliance and stabilize a respondent before release."[24]

We find Declan's position more persuasive because his outpatient treatment proposal directly and pointedly addressed the State's primary concern: the possibility that Declan might not continue taking his medication.

The commitment order was premised on the clearly erroneous assumption that Declan was, within the context of his outpatient treatment proposal, unlikely to follow through on medication. But the record establishes that Declan intended to take his medications and that his outpatient treatment proposal was both adequate and feasible.

Declan, the neighbor, and the court visitor all agreed Declan was willing and likely to continue taking his medication. Declan had insight into his illness and a long history of successfully taking medications. He was able to take care of his basic needs and had a stable housing situation. He had a longtime outpatient provider willing

---

[22] 273 P.3d 594, 602 (Alaska 2012) (affirming conclusion that involuntary commitment was least restrictive alternative where respondent lacked sufficient insight and perspective about her condition and need for treatment).

[23] 375 P.3d 51, 59-60 (Alaska 2016) (affirming conclusion that commitment was least restrictive option where respondent could not "understand his situation, symptoms[,] or current illness" and was thus unlikely to take medication in an outpatient setting), *abrogated on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 924-31 (Alaska 2019).

[24] At oral argument the State further asserted that the fact that Declan was released after four days of commitment weighed in favor of concluding that commitment was the least restrictive alternative. We reject this argument. When determining whether an involuntary commitment order was proper, we consider only the information the superior court had at the time of its order. Alaska R. App. P. 210(a). It makes no difference in this analysis whether Declan was released after one day or 30 days.

to support him and provide a prescription. More specifically, the neighbor was willing to check in on Declan multiple times per day and contact the appropriate authorities if he did not take his medications.

There was some evidence to support a finding that Declan was reluctant to take medication exactly as prescribed. But both Declan and the court visitor testified that Declan was willing to take the medication, and the State's withdrawal of the petition for forced medication effectively conceded that forcing Declan to take medication exactly as prescribed was not necessary to his recovery. Given these undisputed facts, including the neighbor's proposal to verify that Declan took medication, it was clear error to find that Declan would not take the medication necessary for his recovery outside of API.

Thus, it is clear that commitment was not necessary to ensure that Declan would take his medication. His outpatient treatment proposal could have achieved the same result by less restrictive means.[25] The State's withdrawal of the involuntary medication petition practically admitted as much. This case is not like those situations in which we have previously affirmed least restrictive alternative determinations.[26] The outpatient treatment proposal directly and pointedly addressed the concern that Declan might discontinue medication. The plan was feasible and would have provided adequate protection to both Declan and the public. Under these circumstances, a finding to the contrary was clearly erroneous.

---

[25] *See* AS 47.30.915(14)(A) (defining "least restrictive alternative" as treatment facilities and conditions that "are no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient").

[26] *See In re Joan K.*, 273 P.3d at 602; *In re Mark V.*, 375 P.3d at 59-60; *In re Connor J.*, 440 P.3d at 165-67; *In re Luciano G.*, 450 P.3d at1264-65.

**B.** **The State Failed To Meet Its Burden By Not Considering Any Treatment Alternatives Beyond Declan's Proposal.**

Even assuming Declan's outpatient treatment proposal had not been feasible, our recent decision in *In re Hospitalization of Sergio F.* would still mandate vacating the commitment order because the State failed to consider any additional less restrictive treatment options. In *In re Sergio F.*, the State rejected the respondent's proposed discharge plan of living with a friend and taking medication on an outpatient basis.[27] The superior court agreed with the State and, without considering any other options, concluded no less restrictive treatment was available.[28] As we explained in *In re Sergio F.*, the failure to consider any additional options severely undermines the validity of a least restrictive alternative determination.[29] The reason for this is clear: Had Declan not suggested the one alternative, there may have been no consideration of less restrictive alternatives at all. And generally speaking, respondents are not in a position to propose adequate less restrictive alternatives. The State is the party with the knowledge and resources to meaningfully consider alternatives, and it is the State's burden to show that it has done so.

Here, the State did not discuss or explore *any* treatment alternatives beyond the one outpatient treatment plan Declan proposed. The State argues Declan's discharge plan was inadequate, but the standard is not whether the one alternative suggested by the respondent is suitable. The standard is whether there is clear and convincing evidence that no less restrictive alternative is available.[30]

---

[27]    529 P.3d 74, 76, 77 (Alaska 2023).

[28]    *Id*. at 77-78.

[29]    *Id*. at 80-82.

[30]    *Id*. at 82.

"The State need not 'prove the unavailability of every imaginable alternative.' "[31] But in this case, the State failed to explore even *a* single alternative outpatient treatment option beyond Declan's proposal.[32] The State thus failed to meet its burden of proving by clear and convincing evidence "that there are no less restrictive alternatives."[33] Thus, even if Declan's proposal had not been feasible, we would resolve the present case in the same way as *In re Sergio F.* and vacate the commitment order.[34]

We have repeatedly emphasized the importance of a rigorous least restrictive alternative requirement.[35] We reject the State's position because if we were to affirm the commitment order, the least restrictive alternative requirement could be rendered meaningless in two ways.

The first is by requiring complete stability prior to release. The superior court found, and the State argues, that involuntary commitment was still necessary because Declan was not yet completely stable. If complete stability is required for

---

[31]     *Id.* at 80 (quoting *In re Hospitalization of Vern H.*, 486 P.3d 1123, 1131 n.31 (Alaska 2021)).

[32]     The State acknowledged at oral argument that there was no evidence in the record regarding consideration of any other alternatives to involuntary commitment.

[33]     *In re Sergio F.*, 529 P.3d at 78-79.

[34]     *Id.* at 82.

[35]     *See In re Hospitalization of Joan K.*, 273 P.3d 594, 601 (Alaska 2012) ("An important principle of civil commitment in Alaska is to treat persons 'in the least restrictive alternative environment consistent with their treatment needs.' " (quoting AS 47.30.655(2))); *In re Hospitalization of Naomi B.*, 435 P.3d 918, 933 (Alaska 2019) ("[F]inding that no less restrictive alternative exists is a constitutional prerequisite to involuntary hospitalization." (quoting *In re Hospitalization of Mark V.*, 375 P.3d 51, 59 (Alaska 2016), *abrogated on other grounds by In re Naomi B.*, 435 P.3d at 924-31)); *In re Mark V.*, 375 P.3d at 58 ("[T]he trial court's deliberate consideration of [whether less restrictive alternatives exist] is critical to the protection of the respondent's liberty interests").

release, then outpatient treatment would *never* be a feasible option. Any continued instability could be grounds for commitment. Requiring complete stability prior to release would defeat a core purpose of the least restrictive treatment alternative: facilitating outpatient recovery in a less restrictive setting when a respondent is approaching stability, but has not yet achieved it.

The second would be to permit the court to simply invoke the "likely to cause harm" or "gravely disabled" findings to conclude that the only viable option is involuntary commitment in a secure psychiatric facility. As we explained in *In re Sergio F.*, a finding of grave disability does not presuppose a finding that involuntary commitment is the least restrictive alternative.[36] These are separate, constitutionally required determinations. The least restrictive alternative requirement adds a crucial layer of protection for respondents. The State must do more than show that a respondent cannot live safely in the community without treatment.[37] Proving that no less restrictive alternative exists requires establishing that the respondent cannot live safely in the community even with less restrictive treatment.[38]

We reiterate that proving there is no less restrictive alternative to inpatient hospitalization "is a substantial burden commensurate with the 'massive curtailment of liberty' imposed by involuntary commitment."[39] At the very least, a finding that there is no less restrictive alternative must include a determination whether the State has considered specific less restrictive treatment options. And, if so, why those alternatives

---

[36]     *In re Sergio F.*, 529 P.3d at 79.

[37]     *Id.*; AS 47.30.915(9)(B) (2021) (requirement for gravely disabled finding). While this appeal was pending, the legislature amended AS 47.30.915, renumbering and modifying several definitions, including that of "gravely disabled." We refer here to the version of the statute in effect at the time of the superior court's order, but also note that our analysis applies equally to the amended statutory scheme.

[38]     *In re Sergio F.*, 529 P.3d at 79.

[39]     *Id.* at 80-81 (quoting *In re Naomi B.*, 435 P.3d at 928).

were infeasible and inadequate to protect the respondent and the public, and provide for the respondent's treatment needs.[40] There was no such inquiry in Declan's case. Thus, it was error to order involuntary commitment without determining whether the State meaningfully considered less restrictive alternatives at all, let alone whether it demonstrated those alternatives were not available, feasible, or adequate.

## V.   CONCLUSION

For the reasons stated above, we VACATE the 30-day commitment order.

---

[40]   *Id*. at 81; *see, e.g.*, *In re Naomi B.*, 435 P.3d at 934 (affirming commitment was least restrictive option where "the parties explored several possible alternatives, including outpatient community support and assisted living facilities" and "none of the proposed less restrictive alternatives would protect the public 'from the danger to others that [respondent] currently [poses],' and that [respondent] needed 'a facility like API that is locked and . . . provides 24/7 care' " (second and fourth alterations in original) (quoting superior court order)).