NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of ) | Supreme Court No. S-18785 |
| ) | |
| ARTHUR J. ) | Superior Court No. 3AN-23-01169 PR |
| ) | |
| ) | MEMORANDUM OPINION |
| ) | AND JUDGMENT* |
| ) | |
| ) | No. 2072 – February 5, 2025 |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Courtney R. Lewis, Anchorage, for Arthur J. Laura Wolff, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for the State of Alaska.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A man appeals the superior court's order committing him for mental health treatment. He argues that the State failed to prove that he posed a risk of harm to himself and that no less restrictive alternative to involuntary commitment was available.

---

\* Entered under Alaska Appellate Rule 214.

Because we conclude that the evidence supported a finding that he was gravely disabled, we need not determine whether he also was likely to harm himself. We therefore affirm the commitment order on the basis that he was gravely disabled.

And because the superior court specifically found that the man's testimony about his proposed alternative to commitment was not credible, we affirm the court's finding that there was no less restrictive alternative to commitment.

## II.    FACTS AND PROCEEDINGS

Arthur J.[1] was voluntarily admitted to the Alaska Psychiatric Institute (API) in May 2023.  A week later API staff petitioned the superior court for an order authorizing his continued hospitalization for evaluation.  The court granted the petition.  Several days later API staff petitioned the court for an order authorizing Arthur's 30-day commitment.  The petition alleged that Arthur was likely to cause serious harm to himself and that he was gravely disabled because his severe delusions caused him to refuse necessary medical treatment.

The superior court held a hearing on the petition.  The State called Arthur's treating psychologist and nurse practitioner as witnesses.  The psychologist testified that she believed Arthur suffered from delusional disorder, a form of psychosis in which a person endorses "very unusual beliefs" that other people would not ordinarily believe to be true.  She explained that people with this condition are unable to accept evidence contrary to their delusional beliefs, which prevents them from understanding their beliefs are not grounded in reality.  She stated that Arthur believed that his mother, with whom he lived before his hospitalization, had abducted him as an infant from his birth mother.

The psychologist also testified that Arthur had been diagnosed with human immunodeficiency virus (HIV) and syphilis while he was at API.  She testified

---

[1]    We use a pseudonym to protect the respondent's privacy.

that Arthur was refusing treatment for those conditions because he did not believe he had either of them, and he refused further testing at Providence Hospital to confirm the diagnoses. She stated that she believed his distrust of medical providers was due to his delusional beliefs, as was his refusal to seek treatment for HIV and syphilis. The psychologist testified that Arthur's top priority after his release from API was to go to government agencies to acquire information about his alleged abduction, and not to seek medical treatment. She also testified that she believed Arthur could inadvertently be a danger to himself and would suffer continued psychological distress without treatment for his delusional disorder. Finally, the psychologist testified that no less restrictive alternative than commitment to API could adequately serve Arthur's treatment needs.

A nurse practitioner who treated Arthur also testified, describing Arthur's beliefs about his upbringing and abduction from his "real" family. The nurse practitioner testified that Arthur's thought processes had become increasingly delusional since his admission to API. As an example he referred to Arthur's belief that a public health worker who came to API to conduct contact tracing after his HIV diagnosis was actually part of a group called "Blackface," and had come in and out of his life in recent years. The nurse practitioner stated that it was clear to him that Arthur had never met the worker before she arrived at API.

The nurse practitioner also testified that Arthur was likely to be a danger to himself because he refused treatment for syphilis and HIV, even though syphilis is easily treated and HIV can be effectively managed. The nurse practitioner acknowledged that he did not believe Arthur would be at risk of harming himself if he had not been diagnosed with those conditions. He differentiated Arthur's situation from a person who knowingly refused medical treatment despite accepting the fact of the diagnosis as true. The nurse practitioner described Arthur's HIV and syphilis diagnoses as "not real to him." He was also concerned that Arthur's delusional disorder was

worsening because he had incorporated people he met at API into his delusions, which the nurse practitioner believed would continue to worsen if Arthur did not receive treatment. He testified that without a court order Arthur had not been taking medication and API had not been able to treat Arthur's delusions.

The nurse practitioner testified that there was no less restrictive alternative to commitment because Arthur had refused to consider any of the "numerous different alternatives in terms of both medical and mental health treatment" that API had recommended. And he testified Arthur had indicated he would not return to his mother's home if he was released from API.

Arthur testified after API's witnesses. He described reading a book given to him by a stranger that featured an Alabama court decision about an abducted child. He said it prompted him to research his own background, and he believed that he could be the abducted child. Arthur testified that the abducted child was born with a club foot, and that while he did not know if he was born with a club foot, he thought it was a possibility because his feet were two different sizes. Arthur testified that different sized feet can result when a club foot "grow[s] into a normal foot."

Arthur testified that he had spoken with his mother and agreed that he would return to her home after he was released, and they would research medical providers together. Arthur stated he would look for medical care outside of API or Providence Hospital because he believed those facilities discriminated against him based on his race and sexual orientation. He also stated he had reservations about those hospitals because of inconsistent test results,[2] and going "weeks" without getting results he was told he would receive the same day.

---

[2] Arthur was apparently initially told that he did not test positive for HIV or syphilis, but additional testing showed positive results.

The superior court made oral and written findings and committed Arthur to API for up to 30 days. The court found by clear and convincing evidence that Arthur was mentally ill. It reasoned that there was no evidence that Arthur was actually abducted as a child, and it was not a rational conclusion to draw from the story about an abducted child in Alabama. The court also pointed to evidence that Arthur's delusions were "expanding" and "interfering with his ability to process the medical diagnoses that he's received in a reasonable way."

The court also found by clear and convincing evidence that Arthur was likely to cause serious harm to himself, but noted, "I'm not sure that I can conclude that he's gravely disabled." And it found that the evidence indicated Arthur's belief about his abduction as a child was a recent delusion, and that Arthur's health would deteriorate. The court explained its concern that if Arthur continued to deteriorate and refuse treatment, his delusional disorder and physical illnesses "combined together have the potential of reinforcing one another and making his vulnerability greater."

The court found there was no less restrictive alternative to commitment at API. It specifically found that Arthur's assertion that he would return to his mother's home and seek medical treatment was not credible due to his prior, repeated statements that he would not return there.

Arthur appeals, arguing that the court erred by finding he was likely to harm himself and that there was no less restrictive alternative to commitment.

## III.   STANDARD OF REVIEW

We review factual findings in involuntary commitment proceedings for clear error.[3] A factual finding is clearly erroneous if a review of the record leaves us

---

[3]   *In re Hospitalization of Declan P.*, 538 P.3d 318, 322 (Alaska 2023).

with "a definite and firm conviction that a mistake has been made."[4] "Whether those factual findings meet statutory standards for involuntary commitment is a question of law to which we apply our independent judgment."[5] "We may affirm the superior court on any basis supported by the record."[6]

## IV. DISCUSSION

Arthur argues that the evidence presented to the superior court was insufficient to show that he was likely to cause himself harm, or that no less restrictive alternatives to commitment existed. Therefore he contends it was legal error to conclude he met the statutory threshold for involuntary commitment. We affirm the order granting the petition for Arthur's commitment, but not on the grounds that the superior court found. Instead, we conclude that the evidence supports finding that he was gravely disabled and that the State demonstrated there was no less restrictive alternative to commitment to API.[7]

### A. The Superior Court Did Not Err By Ordering Commitment.

A court may order an involuntary commitment lasting no longer than 30 days if it finds by clear and convincing evidence that a respondent is mentally ill and is (1) likely to cause serious harm to self or others; or is (2) gravely disabled.[8] "Evidence

---

**4** *In re Hospitalization of Naomi B.*, 435 P.3d 918, 923 (Alaska 2019) (quoting *In re Hospitalization of Jacob S.*, 384 P.3d 758, 763-64 (Alaska 2016)).

**5** *In re Declan P.*, 538 P.3d at 323.

**6** *Native Vill. of Chignik Lagoon v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 518 P.3d 708, 712 (Alaska 2022) (quoting *Leahy v. Conant*, 436 P.3d 1039, 1043 (Alaska 2019)).

**7** We therefore do not address Arthur's argument about the likelihood that he would cause harm to himself or others.

**8** AS 47.30.735(c); *see also* AS 47.30.915(17) (defining "mental illness" as "impairment that has substantial adverse effects on an individual's ability to exercise conscious control of [their] actions or ability to perceive reality or to reason or understand").

is clear and convincing if it produces 'a firm belief or conviction about the existence of a fact to be proved.' "[9] We have also described this standard "as evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt."[10]

A person is "likely to cause harm" under the commitment statutes if the person's behavior demonstrates (1) a substantial risk of bodily self-harm, (2) a substantial risk of harm to others which may result in "physical injury, physical abuse, or substantial property damage," or (3) the intent to "carry out plans" to cause self-harm, or harm to another.[11] A person is gravely disabled if the person is either "in danger of physical harm arising from . . . neglect of basic needs . . . as to render serious accident, illness, or death highly probable if care by another is not taken," or "so incapacitated that the person is incapable of surviving safely in freedom."[12]

The superior court found Arthur was mentally ill based on his treating psychologist's and nurse practitioner's testimony. The psychologist testified that Arthur met the criteria for "delusional disorder." The nurse practitioner testified that Arthur's delusional disorder continued to increase in severity while he was at API and that he began to incorporate strangers he met into his delusions, such as the person employed by the State to perform contact tracing for infectious diseases.

The psychologist further testified that it was likely Arthur's symptoms would lead him to continue to suffer psychological distress, and that because he had "never lived independently" he would likely be homeless if he were discharged. The

---

[9] *In re Hospitalization of Jonas H.*, 513 P.3d 1019, 1023 (Alaska 2022) (quoting *In re Hospitalization of Luciano G.*, 450 P.3d 1258, 1262-63 (Alaska 2019)).

[10] *Id.* (quoting *In re Hospitalization of Stephen O.*, 314 P.3d 1185, 1193 (Alaska 2013)).

[11] AS 47.30.915(15).

[12] AS 47.30.915(11).

psychologist explained that she believed Arthur would not seek medical treatment and would instead focus on confirming his birth identity at local government offices.

The nurse practitioner testified syphilis could be "easily treated" and HIV "effectively managed." He also testified, however, that left untreated HIV can eventually become acquired immunodeficiency syndrome (AIDS) and syphilis can lead to nerve, muscle, and brain damage. The psychologist believed that Arthur "could inadvertently be a danger to himself if he continues to state that he does not have syphilis or HIV or if he does not seek prompt medical treatment." And both experts testified that his refusal to seek treatment was due to his delusional beliefs, and not because he was knowingly declining treatment.

API's petition alleged both that Arthur presented a threat of harm to himself or others and that he was gravely disabled. The superior court found that he was likely to harm himself and did not find him gravely disabled. But Arthur had notice that commitment based on either ground was possible.[13] And we "may affirm the superior court on any basis supported by the record."[14] The evidence before the court demonstrated that Arthur was in "danger of physical harm arising from such complete neglect of basic needs for . . . personal safety as to render serious . . . illness, or death highly probable if care by another is not taken."[15]

Because Arthur's delusions caused him to question the validity of his diagnoses and avoid seeking prompt medical treatment, they placed him in danger of

---

[13]    *See In re Hospitalization of Carl S.*, 510 P.3d 486, 493-95 (Alaska 2022) (holding due process was violated where respondent committed on basis not pled in petition).

[14]    *Native Vill. of Chignik Lagoon v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 518 P.3d 708, 712 (Alaska 2022) (quoting *Leahy v. Conant*, 436 P.3d 1039, 1043 (Alaska 2019)).

[15]    *See* AS 47.30.915(11).

serious illness or death. And the risk of serious illness is heightened by the likelihood that he would become homeless upon release from API and continue to refuse treatment.

We have affirmed findings that a respondent was gravely disabled because he was "severely distressed and suffering significant impairment in his ability to function independently" due to mental illness.[16] As the API witnesses testified, Arthur's delusions prevented him from believing test results showing that he had contracted two serious illnesses and from seeking treatment for them. The delusions also led Arthur to focus his attention on unrealistic beliefs about his family and others, and to devote his energy to confirming those beliefs rather than obtaining readily available treatment. As a result, without treatment at API, Arthur's mental and physical conditions would continue to worsen, placing him at risk of serious injury or death.

The likely resulting harm to Arthur is not as active or imminent as the harm we have previously determined is sufficient to justify a finding of harm to self.[17] It more clearly supports a finding of grave disability which "is concerned with a more passive condition, whereby the respondent is so unable to function that he or she cannot exist safely outside an institutional framework due to an inability to respond to the essential demands of daily life."[18]

In *In re Hospitalization of Jeffrey E.*, we affirmed the commitment of a young man who had "more or less remained seated in a catatonic state" for several days

---

[16] *In re Hospitalization of Rabi R.*, 468 P.3d 721, 734 (Alaska 2020) (affirming 30-day commitment where respondent "did not have insight into his mental illness" and judgment was so impaired that he could not keep himself safe in community).

[17] *See Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 376 (Alaska 2007), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918, 931 (Alaska 2019); *see also* AS 47.30.915(15).

[18] *Wetherhorn*, 156 P.3d at 376.

before arriving at API based on a finding that he was gravely disabled.[19] We cited the superior court's finding that "the catastrophic consequences of ceasing to take the medication are so high that he simply needs more time in the shelter of API to get himself together."[20] And in *In re Hospitalization of Tracy C.* we also affirmed the finding that a woman diagnosed with bipolar disorder was gravely disabled, even though her condition had improved at API, because "she did not fully understand her need for treatment" and "refused medication."[21]

The superior court found that Arthur was likely to cause harm to himself if he did not seek treatment for his "significant" diagnoses. Arthur's condition may not yet be as severe as *Jeffrey E.*'s catatonia, but as in *Tracy C.*,[22] Arthur's conditions will continue to deteriorate without treatment. Because the evidence demonstrated that his delusional disorder led him to avoid treatment for medical conditions that will continue to worsen without it, we affirm the commitment order because he was gravely disabled.[23]

**B.    The Superior Court Did Not Err By Finding There Was No Less Restrictive Alternative To Commitment.**

Arthur also argues that the superior court erred when it found that there was no less restrictive alternative to commitment. A court must find that no less

---

[19]    281 P.3d 84, 85 (Alaska 2012).

[20]    *Id*. at 88.

[21]    249 P.3d 1085, 1087-88 (Alaska 2011).

[22]    *Id*.

[23]    Because API petitioned for Arthur's commitment on the ground that he was gravely disabled, his due process rights are not violated by affirming his commitment on that basis. *Cf. In re Hospitalization of Carl S.*, 510 P.3d 486, 493-95 (Alaska 2022) (holding due process was violated where respondent committed on basis not pled in petition).

restrictive alternative to commitment exists before ordering commitment.[24] Arthur argues that even though he was "not required to supply a less restrictive alternative," he did so when he testified that he was willing to return to his mother's home and then look for treatment with her help.

The superior court did not find Arthur's testimony that he was willing to return to his mother's home credible, noting that it was a "sudden change" from his position that he would not return there and preferred to live on the streets instead. The API providers testified that Arthur had repeatedly said he was not willing to return to his mother's home, and that they did not believe there was a viable, less-restrictive alternative. "Factual determinations, including judging the credibility of witnesses, is left to the fact finder, and appellate courts must give trial courts' 'factual determinations particular deference when they are based on oral testimony.' "[25] The superior court did not clearly err by finding that Arthur's testimony that he would return to his mother's house was not credible. Given this credibility finding, we see no error in the court's ruling that there was no less restrictive alternative to commitment.

## V. CONCLUSION

We AFFIRM the superior court's order authorizing Arthur J.'s commitment for 30 days.

---

[24] *See* AS 47.30.735(d); *see also In re Hospitalization of Declan P.*, 538 P.3d 318, 323 (Alaska 2023) ("[T]he petitioner must establish by clear and convincing evidence that no feasible, less restrictive alternative to involuntary commitment is available.").

[25] *State v. Grubb*, 546 P.3d 586, 603 (Alaska 2024) (quoting *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 396 (Alaska 2017)).