NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Necessity for the Hospitalization of | ) ) ) Supreme Court Nos. S-18961/18971 |
| A.L. | ) ) Superior Court No. 3AN-23-02543 PR ) ) ) MEMORANDUM OPINION ) AND JUDGMENT* ) ) No. 2138 – March 11, 2026 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Megan R. Webb, Assistant Public Defender and Terrence Haas, Public Defender, Anchorage, for A.L., Robert Bacaj, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, for State of Alaska.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I. INTRODUCTION

A man suffering from delusions of a home invasion fired a shotgun into a neighboring duplex. The superior court authorized his involuntary commitment to a psychiatric institute for 30 days and the administration of non-crisis psychotropic medication. Shortly before the 30-day commitment order was set to expire, the superior court authorized 90 additional days of involuntary commitment.

---

\* Entered under Alaska Appellate Rule 214.

On appeal, the man challenges the medication order and the 90-day commitment order. He argues that the State failed to establish by clear and convincing evidence that there was no less restrictive alternative to the administration of psychotropic medication or to confinement. Observing no error, we affirm the court's orders.

## II. FACTS AND PROCEEDINGS

### A. Facts

As an adult, A.L. began to suffer from delusions that people had conspired against, poisoned, and attacked him and his family.[1] One night in October 2023, while experiencing delusions that people were conspiring against, poisoning, and attacking him and his family, he fired gunshots into an adjoining duplex.

Following the shooting, A.L. was arrested and placed in the forensic unit at the Alaska Psychiatric Institute (API) for competency restoration. After a month passed, the criminal case against him was dismissed, and API staff petitioned for an order authorizing him to be hospitalized for a mental health evaluation. The superior court granted the evaluation petition.

### B. Proceedings

#### 1. Thirty-day commitment hearing

In November, API staff filed a petition for 30-day commitment, alleging that A.L. was mentally ill and likely to cause serious harm to others because he intended to return to the duplex where he had shot through the wall. A superior court master held a 30-day commitment hearing that same day.

The court first heard testimony from a psychiatrist at API. The psychiatrist testified that A.L. had been diagnosed with schizoaffective disorder, bipolar type. He explained that A.L.'s delusions regarding the home invasion had not abated

---

[1] We use initials at A.L.'s request to protect his privacy.

in his time at API, that A.L. did not believe that he was suffering from a mental illness, and that he had refused any treatment or medication. The psychiatrist expressed concern that A.L.'s delusions would persist if left untreated, and he might commit another violent act.

A.L. then testified on his own behalf. He stated that he wanted to "go[] back to the place where I was raised . . . to finish what I started when I was yanked from my home that night after the home invasion." He did not accept that he was experiencing delusions requiring treatment.

The superior court issued an order authorizing the 30-day commitment. The court found that "there is no less restrictive treatment alternative to commitment at API because [A.L.] has [refused] and continues to refuse medication."

## 2. Medication hearing

Five days later, the API psychiatrist filed a petition seeking court approval to administer psychotropic medication to A.L. during the 30-day commitment period. The petition indicated that A.L. had refused medications and that there were no less intrusive treatment options available because therapy and group treatments would be "ancillary to medications." The master held a hearing on the medication petition and heard testimony from a court visitor and from the API psychiatrist.

The court visitor reported that A.L. had been diagnosed with delusional disorder.[2] She explained that she had spoken with A.L.'s girlfriend, who had "observed him yelling at or responding to stimuli she could not see." The court visitor had attempted to speak with A.L. several times on the phone and in person, but he had been unwilling to talk to her. Based on her review of the record, her conversations with A.L.'s girlfriend and the API psychiatrist, and her interactions with A.L., she concluded

---

[2] As the API psychiatrist further explained at the 90-day commitment hearing, he had modified A.L.'s initial diagnosis of schizoaffective disorder, bipolar type because A.L.'s behavior was more indicative of delusional disorder.

that he "is not currently competent to give or withhold informed consent, as he is not yet able to assimilate relevant facts."

The API psychiatrist testified that A.L. was unable to make an informed decision regarding medication because he lacked insight into his diagnosis. The psychiatrist testified that A.L.'s delusional disorder would persist in severity without proper medication, and that less invasive treatments like cognitive behavioral therapy on its own would be insufficient for treating A.L. He explained that therapy would take longer to work than medications and would require A.L. to "have some alliance with a therapist and recognize and develop some insight that there's a problem with his beliefs and be able to work with them over time." At that time, A.L. had access to a therapist at API but had not yet developed an alliance with that person.

The superior court granted the medication petition. The court found that A.L. did not meet the statutory guidelines for determining competency to give or withhold informed consent because he "vehemently denie[d] the existence" of his delusional disorder.[3] It then concluded that administration of psychotropic medication was in A.L.'s best interest because cognitive behavioral therapy was not a sufficient alternative treatment.[4]

### 3. 90-day commitment hearing

In December, the API psychiatrist filed a petition for 90-day commitment. The petition indicated that A.L. "[l]acks insight and refuses all medications for his psychotic delusions" and that "[h]e continues to have what appear to be severe delusions since admission, that he is the victim of terrorism, poisoning." The master held a 90-day commitment hearing on December 18. The psychiatrist and an API mental health clinician testified at the hearing.

---

[3]    *See* AS 47.30.837(d)(1).

[4]    *See* AS 47.30.837(d)(2).

The psychiatrist testified that A.L. continued to believe that people had invaded his home, stolen from him, and poisoned him. However, he had begun to "qualif[y]" his retelling of the delusions, suggesting to the psychiatrist that "he thinks maybe some of it didn't happen." The psychiatrist believed that this improvement could be attributed at least in part to the protected, therapeutic environment at API.

The psychiatrist testified that there was "still room for improvement" in A.L.'s condition, and he had petitioned for the 90-day commitment so that A.L. could "have some stability and potentially some therapy." He explained that delusional disorders "tend to improve slowly," often requiring a month or more of treatment. At the time of the hearing, A.L. had been taking psychotropic medications for five days, but it would take "a month to two months to see the full effect of an antipsychotic medication." The API psychiatrist testified that A.L.'s condition could continue to improve outside of API if he continued to take psychotropic medications and pursue treatment. A.L.'s primary care provider had referred him to a psychiatrist, and he had expressed willingness to see a psychiatrist and continue his medications after he left API. Moreover, the API psychiatrist would be able to provide him with a 30-day supply of medications upon his release from API.

The API psychiatrist also discussed the housing options available to A.L. if he were to be released from API. He testified that A.L. wanted to return to the apartment where he had shot through the wall but would be unable to do so because his neighbor had obtained a restraining order against him. When the psychiatrist explained to him that he could not return to his former apartment, A.L. had proposed that he could stay with his grandmother, an aunt, or other family members. However, A.L. did not understand that the restraining order would prevent him from living in his former apartment. A.L. "reportedly [did] not have access to a gun." The psychiatrist believed that he would still present "some degree of risk [to others] based upon past behavior," but "[i]t's just maybe less of a risk than there was before."

Following the API psychiatrist's testimony, a mental health clinician testified that there was an eviction notice for A.L.'s apartment. The mental health clinician predicted that if discharged from API, A.L. would "either figure out to stay with a family or friend, or . . . go to the shelter."

At the conclusion of the hearing, the master determined that A.L. was mentally ill as a result of his "fixed and persistent" delusions and that there was no less restrictive alternative "that can provide for his mental health needs as well as to secure the safety of other people, including him." The master expressed skepticism "that a person who doesn't think he's mentally ill would follow up with making mental health care appointments . . . or that he would take medication." In a proposed written order, the master found that A.L. "does believe that he has the right [to] self-defense and remains a danger to others as a result of his delusions." Regarding the absence of a less restrictive alternative, the master found that guns would be "readily available in Anchorage and the surrounding towns," and that there was "no evidence" that A.L. would continue to take medication or engage in outpatient treatment if he were released from API.

The superior court then adopted the master's proposed order. The court wrote that "[b]ased on its own de novo review of the hearing record, the superior court affirms the magistrate judge's findings (in their entirety) and adopts them as its own."[5]

A.L. appeals the medication order and the 90-day commitment order.

---

[5]    A.L. was released from custody a month later, after API staff determined that he no longer met the criteria for commitment.

## III. STANDARD OF REVIEW

In involuntary commitment and medication proceedings, we review the superior court's factual findings for clear error.[6] A finding is clearly erroneous "if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[7] "We defer to a superior court's credibility determinations, particularly when they are based on oral testimony"[8] and "grant especially great deference" to the superior court's weighing of conflicting evidence.[9] Whether factual findings "meet the statutory requirements for involuntary commitment or medication is a question of law" that we review de novo.[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Determining That There Was No Less Restrictive Alternative To Medication.

A.L. argues that the superior court should not have authorized the administration of psychotropic medications because cognitive behavioral therapy was a sufficient less restrictive alternative. He contends that any difference in effectiveness between medication and therapy was simply a matter of timing, as therapy could take longer than medication to bring about an improvement in his condition. The State rejects this framing, arguing that therapy cannot supplant medication as the primary treatment for delusional disorder because "[a]bsent medication, it is difficult to

---

[6] *In re Naomi B.*, 435 P.3d 918, 923 (Alaska 2019).

[7] *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 178 (Alaska 2009).

[8] *In re Jacob. S.*, 384 P.3d 758, 769 n.36 (Alaska 2016) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[9] *Id.* at 768 (quoting *In re Tracy C.*, 249 P.3d 1085, 1089 (Alaska 2011)).

[10] *In re Naomi B.*, 435 P.3d at 923-24.

convince a patient suffering from delusions that their thinking is disordered and their fixed beliefs are false."

"A respondent committed for mental health treatment may be forced to take medication only if the court finds, by clear and convincing evidence, that . . . no less intrusive treatment is available . . . ."[11] In determining whether a less intrusive alternative exists, a court must weigh the respondent's fundamental liberty and privacy interests against the state's compelling interest in protecting an individual who lacks capacity, and must conduct a "factual assessment of 'the feasibility and likely effectiveness of a proposed alternative.' "[12] A proposed less intrusive alternative "must actually be available, meaning that it is feasible and would actually satisfy the compelling state interests that justify the proposed state action."[13]

Here, clear and convincing evidence supported the superior court's conclusion that there was no less restrictive alternative to psychotropic medication. At the medication hearing, the API psychiatrist testified that therapy was "the second line treatment after antipsychotic medications" but could not be "the primary choice alone." He explained that A.L. lacked insight into the existence of his delusional disorder and that therapy would only be effective if he developed an alliance with a therapist and recognized the falsity of his beliefs. This is more than an issue of timing; it shows that therapy alone could not provide a feasible alternative that would satisfy the state's

---

[11] *In re Carter K.*, 557 P.3d 755, 766 (Alaska 2024). Clear and convincing evidence is "evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt." *Bigley*, 208 P.3d at 187 (quoting *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994)). In other words, "[e]vidence is clear and convincing if it 'produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.' " *In re Naomi B.*, 435 P.3d at 934 n.80 (quoting *Bigley*, 208 P.3d at 187).

[12] *In re Naomi B.*, 435 P.3d at 935–36 (quoting *Bigley*, 208 P.3d at 185).

[13] *In re Carter K.*, 557 P.3d at 766 (quoting *In re Naomi B.*, 435 P.3d at 936).

compelling interests in protecting A.L. and the public.[14]  The superior court credited the API psychiatrist's testimony in its determination that "the proposed alternative, cognitive behavioral therapy, would not be sufficient treatment."  The superior court did not err when it determined that there were no less restrictive alternatives to medication.

**B.  The Superior Court Did Not Err In Determining That There Was No Less Restrictive Alternative To 90-Day Confinement.**

A.L. also argues that the superior court erred when it found there was no less restrictive alternative to a 90-day commitment order.  The parties disagree as to which findings we may consider in our review.  In its argument that there was no less restrictive alternative to 90-day confinement, the State points to oral findings by the master that were not referenced in the superior court's written order.  A.L. argues that we may not consider these findings because they create an inconsistency between the oral ruling and the written order.  We decline to thus limit the scope of our consideration.

In general, "where inconsistencies exist between a court's written findings and its oral statements, the written findings control."[15]  However, where written and oral findings are not inconsistent, a court should consider the transcript of the oral ruling.[16]  For example, in *In re Hospitalization of Jacob. S.*, we considered both the "limited analysis" in the superior court's written order and the court's "more in-depth" oral findings to determine that the record supported the superior court's conclusion that

---

[14]     *See Kiva O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 408 P.3d 1181, 1190-92 (Alaska 2018) (concluding that proposed alternatives to psychotropic medications would not be effective to satisfy state's compelling interest based on doctor's testimony "that he would recommend such therapies only in conjunction with medication, not in lieu of it").

[15]     *K.T.E. v. State*, 689 P.2d 472, 477 (Alaska 1984).

[16]     *Del Rosario v. Clare*, 378 P.3d 380, 384 (Alaska 2016).

there was no less restrictive alternative to confinement.[17]  Here, the master reached the same conclusion in both its oral and written orders.  The superior court then "affirm[ed] the magistrate judge's findings (in their entirety) and adopt[ed] them as its own."  A.L. suggests that the phrase "in their entirety" encompasses only the master's written findings, but nothing in the language of the court's order indicates that it intended to limit its consideration in this way.  Therefore, we consider both the court's oral and written findings in determining whether committing A.L. to API was the least restrictive treatment available.

Turning to the merits of the superior court's decision, A.L. makes two arguments against the sufficiency of the court's findings.  First, he asserts that the court failed to make the necessary findings as to whether the State considered less restrictive treatment options beyond his own proposal that he could live with a family member and engage in outpatient treatment.  Second, he argues that the superior court's factual findings are clearly erroneous and do not support the conclusion that there was no less restrictive treatment available.  We disagree and conclude that clear and convincing evidence supports the least restrictive alternative determination.

When the State seeks to involuntarily commit a patient, it carries the burden of "establish[ing] by clear and convincing evidence that no feasible, less restrictive alternative to involuntary commitment is available."[18]  Alaska law defines "least restrictive alternative" as a treatment option that is "no more harsh, hazardous, or intrusive than necessary to achieve the treatment objectives of the patient" and that "involve[s] no restrictions on physical movement nor supervised residence or inpatient care except as reasonably necessary for the administration of treatment or the protection

---

[17]     *In re Jacob S.*, 384 P.3d at 768-69 (Alaska 2016).

[18]     *In re Declan P.*, 538 P.3d 318, 323 (Alaska 2023).

of the patient or others from physical injury."[19]  A less restrictive alternative must also be "feasible, available, and provide 'adequate treatment' for a respondent."[20]

We have explained that the superior court's "deliberate consideration" of the existence of less restrictive alternatives "is critical to the protection of the respondent's liberty interests."[21]  And "[a]t the very least, a finding that there is no less restrictive alternative must include a determination whether the State has considered specific less restrictive treatment options."[22]  In examining potential less restrictive treatment options, "[t]he State need not 'prove the unavailability of every imaginable alternative.' "[23]  But where the State does not explore any outpatient treatment option beyond the plan suggested by the respondent, this may demonstrate that the State failed to meet its burden.[24]

The evidence presented at the 90-day commitment hearing satisfied the State's burden to demonstrate that no feasible, less restrictive alternative to confinement existed.  At that time, A.L. had been taking psychotropic medications for only five days, much less than the time required for the medication to become effective.  Although A.L.'s delusions had "softened" somewhat, they continued to persist.  He had expressed an interest in returning to his former apartment — the location tied to his delusions — and did not believe that a restraining order would prevent him from doing

---

[19]  AS 47.30.915(14)(A)-(B).

[20]  *In re Sergio F.*, 529 P.3d 74, 79 (Alaska 2023) (footnote omitted) (quoting *In re Danielle B.*, 453 P.3d 200, 204 (Alaska 2019)).

[21]  *Id.* at 78 (quoting *In re Mark V.*, 375 P.3d 51, 58 (Alaska 2016), *abrogated on other grounds*, *by In re Naomi B.*, 435 P.3d 918, 923 (Alaska 2019)).

[22]  *In re Declan P.*, 538 P.3d at 326-27.

[23]  *In re Sergio F.*, 529 P.3d at 80 (quoting *In re Vern H.*, 486 P.3d 1123, 1131 n.31 (Alaska 2021)).

[24]  *Id.*

so. These conditions limited the menu of options that the State could reasonably consider for his treatment, given his continued belief that he was not suffering from a mental illness.[25] The superior court expressed skepticism that A.L. would engage in outpatient treatment on his own initiative. These findings adequately demonstrate that the State explored and the superior court sufficiently considered the existence of less restrictive alternatives.

Moreover, in light of the uncontradicted danger that A.L. posed to himself and to the public, there was clear and convincing evidence that no less restrictive alternative could further the State's compelling interest and provide adequate treatment. A.L. points to the improvement in his condition and argues that complete stability is not required for a patient to be released from involuntary commitment. But in A.L.'s case, he continued to pose a risk of harm to the public until his delusions had significantly abated, a process that the API psychiatrist explained would likely take additional time. Relying on the API psychiatrist's testimony, the superior court found that A.L.'s delusions were "fixed and persistent," that he would not seek treatment on an outpatient basis, and that his belief in his "right to self-defense" could cause him to commit further violent acts. The superior court did not err when it determined there were no less restrictive alternatives to 90-day commitment.

## V.    CONCLUSION

We AFFIRM the superior court's orders authorizing the administration of psychotropic medication and the 90-day commitment.

---

[25]    *See In re Naomi B.*, 435 P.3d at 933-34 (affirming superior court's conclusion that proposed outpatient treatment options were not sufficient to protect public from dangerous behavior by respondent who experienced violent delusions).